**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE COTY INC. SECURITIES LITIGATION

Case No. 1:26-cv-02343-RA-VF

CLASS ACTION

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 2

II. JURISDICTION AND VENUE .......... 9

III. PARTIES .......... 9

IV. RELEVANT NON-PARTIES .......... 11

V. SUBSTANTIVE ALLEGATIONS .......... 11

A. Coty Is a Global Beauty Company with a Portfolio of Brands Spanning Fragrance, Color Cosmetics, Body Care, and Skincare .......... 11

B. On the Eve of the Class Period, Coty Launches the Next Phase of Its Purported Transformation Program Dubbed "All-in to Win" .......... 13

C. Unbeknownst to Investors, Coty's Innovation Pillar of Curtailing Over-Innovation and Product Resource Prioritization Was a Failure .......... 15

D. Coty's "Blockbuster" Hugo Boss Bottled Beyond Launch Did Not "Elevat[e]" the Brand or Create a "Halo Effect" as Represented .......... 18

VI. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND GRADUALLY REVEALED THE TRUTH THROUGH PARTIAL DISCLOSURES .......... 19

A. False and Misleading Statements on May 6 and May 7, 2025 .......... 19

B. Defendants Partially Disclosed the Truth on August 20 and 21, 2025 .......... 25

C. Continued False and Misleading Statements on August 20 and 21, 2025 .......... 29

D. False and Misleading Statements on November 5 and 6, 2025 .......... 36

E. Defendants Finally Disclose the Truth on February 5 and 6, 2026 .......... 41

VII. POST-CLASS PERIOD ADMISSIONS .......... 49

A. May 6, 2026 3Q2026 Earnings Call Q&A .......... 49

VIII. ADDITIONAL SCIENTER ALLEGATIONS .......... 51

A. Strobel's and Defendant Mercier's Admissions Support a Strong Inference of Scienter. 51

1. Over Innovation .......... 51

2. Hugo Boss Bottled Beyond .......... 53

B. Defendants' Regular and Detailed Commentary, Holding Themselves Out as Knowledgeable, and in Response to Analyst Questions, Shows They Closely Monitored and Tracked Product Performance .......... 54

C. Defendants' Next Phase of All-in to Win Program, and Active Involvement in an Extensive Strategic Review, Support Scienter .......... 58

D. Senior Leadership Regularly Discussed Information in Meetings and Regular Reports That was Readily Accessible to the Individual Defendants .......... 60

E. The Suspicious Timing and Context of Defendant Nabi's Sudden Departure Supports Scienter ..... 62

F. Corporate Scienter ..... 63

IX. LOSS CAUSATION ..... 63

X. CLASS ACTION ALLEGATIONS ..... 68

XI. PRESUMPTION OF RELIANCE ..... 70

XII. NO STATUTORY SAFE HARBOR ..... 72

XIII. CLAIMS FOR RELIEF ..... 73

XIV. PRAYER FOR RELIEF ..... 78

XV. JURY DEMAND ..... 78

## COTY INC.'S FISCAL CALENDAR

| Period | Start | End | Class Period |
|---|---|---|---|
| **FY2025** | **July 1, 2024** | **June 30, 2025** | |
| 1Q2025 | July 1, 2024 | September 30, 2024 | |
| 2Q2025 | October 1, 2024 | December 31, 2024 | |
| 3Q2025 | January 1, 2025 | March 31, 2025 | |
| 4Q2025 | April 1, 2025 | June 30, 2025 | Start (5/7/2025) |
| **FY2026** | **July 1, 2025** | **June 30, 2026** | X |
| 1Q2026 | July 1, 2025 | September 30, 2025 | X |
| 2Q2026 | October 1, 2025 | December 31, 2025 | X |
| 3Q2026 | January 1, 2026 | March 31, 2026 | End (2/6/2026) |
| 4Q2026 | April 1, 2026 | June 30, 2026 | |

1. Ksenia Solozobova and Mike Logelin ("Co-Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned attorneys, bring this class action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), individually and on behalf of all persons and entities that purchased or otherwise acquired Coty Inc. ("Coty" or the "Company") securities between May 6, 2025 and February 6, 2026, inclusive, and were damaged thereby (the "Class Period").

2. Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Coty with the SEC; (b) review and analysis of press releases and media reports issued by and disseminated by Coty; (c) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Coty and the industry in which it operates; (d) review of other publicly available information concerning Coty; and (e) interviews with former employees of the Company.

3. Co-Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION[1]

4. Plaintiffs bring this securities fraud class action alleging that, throughout the Class Period, Coty and its former Chief Executive Officer ("CEO") and current Chief Financial Officer ("CFO") knowingly or severely recklessly made material misrepresentations to investors concerning (i) investments that were misallocated away from Coty's core products inconsistent with Coty's All-in to Win program, and funneled into a proliferation of new products that lacked demand, and (ii) the spillover sales, or "halo effect[,]" into Coty's key Hugo Boss brand from its largest product launch in years—the "Boss Bottled Beyond" initiative.

5. Coty is a global beauty company that owns or licenses brands with a product portfolio including fragrances, color cosmetics, body care, and skincare. The Company is organized into two business segments: Consumer Beauty and Prestige. Consumer Beauty is intended for the broader consumer market with brands such as Adidas, CoverGirl, Nautica, and Vera Wang. Prestige is the luxury division of Coty with core brands including Hugo Boss, Burberry, Calvin Klein, Tiffany & Co., and Marc Jacobs.

6. On April 24, 2025, on the eve of the Class Period, Coty announced the next phase of the "All-in to Win" transformation program, which included a heightened focus on product innovation and resource allocation. Defendant Sue Y. Nabi (former CEO) ("Nabi") framed the next phase as required for Coty to "adapt and evolve" to changes in the beauty industry, including by "cementing" the Company's leadership position in fragrances and "expanding into certain growing and profitable beauty categories[.]" One of the "Key Pillars" of the next phase was a

[1] Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted.

"[s]tep-change" in Coty's innovation strategy to "focus organizational efforts and resources into fewer and more impactful initiatives."

7. Throughout the Class Period, which begins on May 6, 2025, the Individual Defendants, Nabi and Laurent Mercier (current CFO) ("Mercier"), falsely reassured investors that Coty was taking actions consistent with the innovation pillar of the next phase of the All-in to Win program. For example, Nabi echoed the April 2025 Press Release (defined below), stating that Coty was "**focusing organizational efforts and resources into fewer and more impactful initiatives**" and further claimed that Coty was reallocating resources to "**support properly the brands with the highest return on investment**," "**taking a more disciplined profit-driven approach to color cosmetics**," and focused on the "**most loyal and profitable**" fragrance categories.

8. However, contrary to these representations, as later admitted and as CW1 confirmed, throughout the Class Period, Coty had a proliferation of unsuccessful SKUs, misallocated product investment resources, and underinvested in core brands.

9. For example, CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, a state of affairs that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, internally warned about.

10. CW1 stated that frequently shifting priorities impeded allocation of marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like

Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend never happened.

11. Defendants themselves gradually admitted Coty had not focused product innovation, which turned off consumers, and had not effectively allocated resources to the "most loyal and profitable" initiatives or those with the "highest return[.]"

12. For example, on August 21, 2025, Defendant Mercier partially admitted Defendants had seen the "slowdown" in the Consumer Beauty category "***probably a year ago***[,]" including "lower consumption" in the U.S. Defendant Nabi also admitted that consumers were experiencing "innovation fatigue" in color cosmetics from Coty's proliferation of innovations.

13. In early February 2026, Defendants further revealed the extent of the product over-innovation and resource allocation issues persisting throughout the Class Period. For example, Markus Strobel (current Executive Chairman and Interim CEO) ("Strobel") attributed Coty's poor earnings in part to the fact that "[***o***]***ver the past couple of years***," across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives." Mercier acknowledged that operational discipline with respect to over-innovation slipped across Coty "***over the past 2 years***" resulting, for example, in the number of SKUs in the CoverGirl innovation bundle ***almost doubling***. Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," that "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference[,]" and that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf."

14. Moreover, on May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume, problem with it, if it doesn't sell out, it comes back in returns and obsolescence[,]" and that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

15. Defendants also made several misstatements regarding the purported "halo effect" of the Hugo Boss Bottled Beyond launch, which Defendants themselves heralded as "probably the ***biggest launch of the company's history***." Starting on November 5, 2025, Defendants represented that the Hugo Boss Bottled Beyond launch was "**<u>elevating the Hugo Boss brand</u>**[,]" and, in response to analyst questions about what was driving future financial performance, Defendants emphasized the launch and its effect as "**<u>continu[ing]</u>**."

16. However, just a few months later, on February 5, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch "did ***not*** translate into the growth of the broader Hugo Boss brand ***in the past 2 quarters***[,]" and on February 6, 2026, he admitted that the Hugo Boss Bottled Beyond launch had "***no halo effect***" on the Hugo Boss brand.

17. Thus, Defendants admit their earlier statements were false when made. In addition to these admissions, other facts show Defendants made false and misleading statements knowingly or recklessly. Indeed, Defendants themselves touted their focus on product innovation and resource allocation, including executing the All-in to Win innovation pillar. Moreover, shortly after the September 30, 2025 announcement of Coty's comprehensive strategic review, Nabi stated that she and Gordon Von Bretten, newly announced President of Consumer Beauty, were "***at the helm***" of driving growth and profitability in color cosmetics.

18. Throughout the Class Period, Defendants also regularly provided detailed updates on, and answers to analyst questions about, granular issues related to product innovation, strategies, trends, prioritization, consumer behavior and demand, and the Hugo Boss Bottled Beyond launch effects.

19. Indeed, at the very beginning of the Class Period, Nabi stated that Coty had conducted "a lot of studies" to understand the "levers" which enabled them to be "granularly decisive" in making the correct product prioritization and resource allocation decisions to support Coty's most profitable color cosmetics products. Also, in August 2025, Nabi responded to an analyst's question about investment levels in mass color cosmetics by referencing consumer studies and insights regarding "innovation fatigue" and calibrating marketing spending that Defendants had obtained ***throughout 2025***. Nabi also touted how closely Defendants were closely monitoring the Hugo Boss Bottled Beyond launch, admitting tracking benchmarks and performance across markets.

20. CW1 confirmed that Coty closely tracked financial performance. CW1 was personally responsible for consolidating financial inputs into monthly close packages for Zavlowsky and drafting presentation materials for finance leadership with narrative commentary explaining the reasons for variances against internal budgets, forecasts, and prior-period performance. CW1 also prepared executive-level packages, which were sent to the direct reports of the CFOs of each business segment. CW1 confirmed that Victoria Evans, Consumer Beauty CFO, and Gregoire Hedde, Prestige CFO, both of whom reported to Defendant Mercier, reviewed the executive-level packages.

21. Coty revealed the truth in two sets of corrective disclosures. First, on August 20, 2025, after the stock market closed for trading, Coty announced, among other disclosures, disappointing 4Q2025 and FY2025 results. Among other items, the Company reported fourth quarter net revenue had declined by 8% year-over-year, operating income for FY2025 was down 56% from FY2024, Prestige net revenue was down 5% year-over-year in the fourth quarter, and Consumer Beauty net revenue for the fourth quarter decreased 12% year-over-year. During the corresponding 4Q/FY2025 earnings calls, both Defendants Nabi and Mercier acknowledged a slowdown in Consumer Beauty and the mass cosmetics category due to innovation fatigue among a subset of consumers.

22. On August 21, 2025, after Defendants' partially corrective disclosures, the price of Coty's common stock declined, on unusually heavy trading volume, from a closing price of $4.86 per share on August 20, 2025, to an intraday low of $3.75 per share.

23. Analysts were surprised by Defendants' disclosures and reacted negatively. For instance, a Citi report downgraded its rating of Coty's stock to Neutral and reduced the Company's stock target price by ***34.6%***. The analysts stated that "[e]ven though the bar was very low for COTY post YTD underperformance, ***F4Q25 results were worse than expected***…" The analysts added that there was "limited visibility on a F2H26 recovery."

24. Nevertheless, Defendants continued to make false and misleading statements—even in the same earnings announcement as the first set of corrective disclosures. Indeed, on August 21, 2025, during the 4Q/FY2025 Earnings Call Q&A (defined below), in response to an analyst's direct follow-up question, Nabi downplayed innovation fatigue as isolated and not affecting fragrances "**<u>at all</u>**[.]"

25. Coty finally revealed the truth on February 5, 2026, after the stock market closed for trading, by announcing, among other disclosures, disappointing 2Q2026 results and withdrawal of prior FY2026 guidance. Among other items, the Company reported second quarter net revenue had increased by 1% year-over-year, second quarter operating income of $148.2 million declined from reported operating income of $268.2 million in the prior year, Prestige net revenue increased 2% year-over-year in the second quarter, and Consumer Beauty net revenue for the second quarter decreased 2% year-over-year. During the corresponding 2Q2026 earnings calls, Strobel and Defendant Mercier made several directly contradictory admissions concerning Coty's product innovation and spend and the "halo effect" of the Hugo Boss Bottled Beyond launch.

26. On February 6, 2026, in response to Defendants' corrective disclosures, the price of Coty's common stock fell sharply, declining from a closing price of $3.15 per share on February 5, 2026 to an intraday low of $2.44 per share, on unusually heavy trading volume.

27. Analysts were shocked by Defendants' disclosures and reacted swiftly and negatively thereto. For example, Raymond James issued a report stating that Coty's 3Q outlook was a "***total surprise***[.]" The report noted that "COTY's early diagnosis of its shortfalls are that the company has not effectively leveraged its launches, with recent launches failing to lift the total franchise" (referring to Strobel's admission of the lack of a Hugo Boss Bottled Beyond "halo" effect), "tighter SKU and innovation discipline" and "exiting smaller initiatives[,]" and "shifting advertising and other brand support behind core franchises[.]" The report described a "[s]obering" near-term, and cited "low visbility [sic]" into any "near-term turnaround[.]"

28. Defendants' fraudulent and misleading statements served to artificially inflate the price of Coty's securities throughout the Class Period, causing massive investor losses when the

price of those securities precipitously declined as the truth was revealed. Plaintiffs hereby seek damages individually and on behalf of the Class.

## II. JURISDICTION AND VENUE

29. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

30. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

32. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa), as Coty's stock is publicly listed and trades within this Judicial District and Coty's principal place of business is located in Manhattan.

33. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephonic and digital communications, and the facilities of a national securities exchange.

## III. PARTIES

34. Co-Lead Plaintiff Ksenia Solozobova purchased Coty common stock during the Class Period, as set forth in her previously-filed certification, incorporated by reference herein (ECF No. 10-1). Co-Lead Plaintiff Mike Logelin purchased Coty common stock during the Class

Period, as set forth in his previously-filed certification, incorporated by reference herein (ECF No. 18-2). Plaintiffs suffered damages as set forth herein.

35. Defendant Coty Inc. is a Delaware corporation with principal executive offices located at 350 Fifth Avenue New York, NY 10118. Coty's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol COTY.

36. Defendant Sue Y. Nabi served as CEO of Coty from September 1, 2020 until December 31, 2025. On December 22, 2025, Coty announced Nabi would "cease to serve" as the CEO and resign as a member of the Board of Directors (the "Board") effective December 31, 2025 and that Markus Strobel would serve as Executive Chairman of the Board and Interim CEO effective January 1, 2026. On February 5, 2026, Coty filed a Separation Agreement (the "Nabi Separation Agreement"), entered into with Defendant Nabi, with the SEC as an exhibit to its report on the Company's financial and operational results for its second quarter ended December 31, 2025 (the "2Q2026 Form 10-Q"). The Nabi Separation Agreement, which entitles Coty to a release of claims, states that, effective December 31, 2025, Nabi's employment as CEO "will terminate . . . ."

37. Defendant Laurent Mercier became CFO of Coty and member of its Executive Committee effective February 15, 2021 and held these positions throughout the Class Period. Prior to his appointment as CFO he served as Coty's Deputy CFO since May 2020 and previously as the CFO of Coty's Luxury (Prestige) business since November 2017.

38. Defendants Nabi and Mercier are referred to herein as the "Individual Defendants." Defendants Coty, Nabi, and Mercier are referred to herein as the "Defendants."

## IV. RELEVANT NON-PARTIES

39. Markus Strobel has served as Coty's Executive Chairman and Interim CEO since January 1, 2026 when he assumed the position after Defendant Nabi's termination.

40. CW1 worked at Coty as Senior Manager, Financial Planning & Analysis ("FP&A") from January 2023 through September 2025. CW1 reported directly to Hui Xu, VP of Finance/FP&A, and indirectly to Leah Zavlowsky, CFO of the Americas.

41. As the Senior Manager within the FP&A department, CW1 was personally responsible for consolidating financial inputs into monthly close packages for Zavlowsky and drafting presentation materials for finance leadership with narrative commentary explaining the reasons for variances against internal budgets, forecasts, and prior-period performance.

42. CW1's reporting covered both Consumer Beauty and Prestige and, for most of CW1's tenure, focused on the United States. However, around May 2025, CW1's reporting expanded to also include the United Kingdom, New Zealand, and Australia.

43. CW1 also prepared executive-level packages which were sent to the direct reports of the CFOs of each business segment. CW1 confirmed that Victoria Evans, Consumer Beauty CFO, and Gregoire Hedde, Prestige CFO, both of whom reported to Defendant Mercier, reviewed the executive-level packages.

## V. SUBSTANTIVE ALLEGATIONS

### A. Coty Is a Global Beauty Company with a Portfolio of Brands Spanning Fragrance, Color Cosmetics, Body Care, and Skincare

44. Coty is a global beauty company that owns or licenses brands organized into two business segments: Consumer Beauty and Prestige. Prestige is the luxury division of Coty,

specializing in high-end fragrances, cosmetics and skincare produces licensed from major fashion houses. Its core brands include Hugo Boss, Burberry, Calvin Klein, Tiffany & Co., Marc Jacobs, and others. The Company primarily sells its Prestige brands via prestige retailers, including perfumeries, high-end department stores, direct-to-consumer websites and duty-free shops.

45. Consumer Beauty, also referred to by Coty employees and in the Company's publicly disseminated disclosures as Mass Beauty, is aimed at the broader consumer market, and offers fragrances, cosmetics (including color cosmetics) and skin and body care products. Its brands include Adidas, CoverGirl, Nautica, and Vera Wang. The Company primarily sells its Consumer Beauty brands at hypermarkets, supermarkets, drug stores and pharmacies, mid-tier department stores, and dedicated e-commerce retailers.

46. Leading up to and throughout the Class Period, the Prestige segment constituted over 60% of Coty's net revenues:

| | **FY2026** | **FY2025** | **FY2024** |
|---|---|---|---|
| **Prestige** | $3,805.8M (65.5%) | $3,820.2M (64.8%) | $3,857.3M (63.0%) |
| **Consumer Beauty** | $2,000.8M (34.5%) | $2,072.7M (35.2%) | $2,260.7M (37.0%) |
| **Total Net Revenues** | $5,806.6M | $5,892.9M | $6,118.0M |

47. Across both segments, the Company's product categories span fragrances, color cosmetics, body care, and skincare. Fragrances include various perfumes, colognes, and mists. Color cosmetics encompasses lip, eye, facial, and other color products, including nail color. Body care includes shower gels, body sprays, and deodorants. Skincare includes moisturizers, serums, sun treatment, cleansers, toners, and anti-aging creams. The Company pursues product innovation through internal research and development groups as well as via affiliations with various universities, technical centers, supply partners, industry associations and technical associations.

48. Throughout the Class Period, fragrances constituted over 60% of Coty's net revenues. Color cosmetics was the second leading product category, amounting to over 20% of the Company's net revenues, but the category constituted a declining share of net revenues each year.

| | FY2026 | FY2025 | FY2024 |
|---|---|---|---|
| **Fragrances** | 67.3% | 67.4% | 63.9% |
| **Color Cosmetics** | 23.6% | 23.7% | 26.4% |
| **Body Care & Other** | 5.3% | 5.3% | 6.1% |
| **Skincare** | 3.8% | 3.6% | 3.6% |
| **Total** | 100% | 100% | 100% |

### B. On the Eve of the Class Period, Coty Launches the Next Phase of Its Purported Transformation Program Dubbed "All-in to Win"

49. In a June 1, 2020 Press Release, Coty formally introduced the "All-in to Win" transformation program and announced a strategic partnership with KKR & Co. Inc. ("KKR"), a major investment firm headquartered in New York known for extremely active management, reflected in the June 1, 2020 Deutsche Bank report stating that KKR "wanted to install its own operations-focused executive[,] Mr. Gordon Von Bretten" as Coty's first Chief Transformation Officer. In the corresponding June 1, 2020 presentation materials, Coty included "[r]ebuilding portfolios by focusing on hero SKU's" among the several focal points of the program.

50. Coty announced the next phase of the "All-in to Win" transformation program in a press release dated April 24, 2025 ("April 2025 Press Release"). Defendant Nabi framed the next phase as required for Coty to "adapt and evolve" to changes in the beauty industry, including by "cementing" the Company's leadership position in fragrances and "expanding into certain growing and profitable beauty categories:"

> With the cyclical and structural changes in the beauty industry and the global economy in recent years, including the rapid acceleration of e-commerce, the

> consolidation of retail channels and customers, and the new ways of consumer brand discovery, Coty must once again adapt and evolve.
>
> This next phase of our transformation program will further strengthen our operating model and simplify our fixed cost structure. We fully anticipate these changes will strongly position Coty to outperform the beauty market in the coming years, cementing our global leadership position in fragrances while expanding into certain growing and profitable beauty categories, all while steadily expanding our gross margins and EBITDA margins.

51. This next phase had four "Key Pillars[,]" including a "[s]tep-change" in Coty's innovation strategy:

> Scaled Markets and Regions: Coty will be streamlining the organizational structure across key markets to unlock operational efficiencies, reduce duplication and better align with the consolidation in the local and regional retail landscape. These market organizations will be part of a more scaled and agile regional set-up, with the regional leaders empowered to accelerate decision-making and faster execution, in keeping with the rapid evolution in today's global beauty markets.
>
> Streamlined Support Functions: Consolidate and centralize support function activities, better aligning with the new regional structures. Coty has already started consolidating demand planning into a single hub, enabled by a state-of-the-art AI-driven demand planning system.
>
> Boost Innovation Impact: Step-change innovation impact by identifying key launch priorities early in the process, and ***focus organizational efforts and resources into fewer and more impactful initiatives***. These will be supplemented by smaller agile innovations to capture short-term opportunities.
>
> Optimize General & Administrative Spending: Structurally reduce non-people fixed costs across all areas of spend.

52. Indeed, at the very beginning of the Class Period, in the 3Q2025 Press Release (defined below), Nabi stated that the next phase of the All-in to Win program was part of Coty's "multi-pronged plan of attack" that was designed, in part, for "accelerating innovation[.]"

53. Thus, Defendants assured investors that Coty would be more focused with product innovations and related resource allocation, and that this was a point of special attention for Defendants.

### C. Unbeknownst to Investors, Coty's Innovation Pillar of Curtailing Over-Innovation and Product Resource Prioritization Was a Failure

54. Consistent with the All-in to Win program's purported change in Coty's innovation strategy to focus efforts and resources into "fewer and more impactful initiatives[,]" as alleged in detail herein, starting May 6, 2025, Defendants assured investors that, *e.g.*, they were "focusing organizational efforts and resources into fewer and more impactful initiatives," and that management "is streamlining core innovation to focus on fewer high-impact initiatives[.]" Relatedly, beginning May 6, 2025, Defendants assured investors that the resources previously spent on such dilutive initiatives were being reallocated to the Company's "profit engines" and core, most profitable "brands with the highest return on investment," and that Coty was "taking a more disciplined profit-driven approach to color cosmetics" and focused on the "most loyal and profitable" fragrance categories.

55. However, contrary to these representations, as later admitted and as CW1 confirmed, throughout the Class Period, the Company had a proliferation of unsuccessful SKUs, amounting to ***over 1,000*** possible brand and market combinations, misallocated product investment resources, and underinvested in core brands.

56. For example, CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results. According to CW1, Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero,

Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, internally warned about excessive product launches and viewed the related directives to launch many of them negatively.

57. CW1 stated that frequently shifting priorities impeded allocation of marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company's mandate to preserve margins.

58. Defendants themselves gradually admitted Coty had not reigned in the over-proliferation of innovations and SKUs, which were overwhelming and turning off consumers, and concomitantly had not effectively allocated product resources as promised.

59. For example, on August 21, 2025, during the 4Q/FY2025 Earnings Call Q&A (defined below), Defendant Mercier partially admitted Defendants had seen the "slowdown" in the Consumer Beauty category "***probably a year ago***[,]" including "lower consumption" in the U.S.

60. Defendant Nabi also admitted that consumers were experiencing "innovation fatigue" in color cosmetics from Coty's proliferation of innovations, and that (contrary to Defendants' prior assurances) Coty had done "more and more launches" which lost a subset of customers. Nonetheless, in response to an analyst's follow-up question, Nabi sought to downplay the issue as isolated and not affecting fragrances "at all[.]"

61. On September 30, 2025, Defendants published a press release ("September 2025 Press Release") announcing a "much closer integration" between Prestige and Consumer Beauty fragrances and a "comprehensive strategic review" of Coty's Consumer Beauty business. Coty stated that the integration between Prestige and Consumer Beauty fragrances was "refocusing the Company on its heritage and core strengths[.]" The strategic review of Consumer Beauty included "assess[ing] a full range of alternatives including partnerships, divestitures, spin-offs, and other potential strategic actions," including how each product fit into Coty's overall product portfolio to "maximiz[e] long-term value…."

62. In February 2026, Defendants revealed the true extent of the product over-innovation issues persisting throughout the Class Period. On Coty's February 5, 2026 2Q2026 Pre-Recorded Earnings Call (defined below), Strobel attributed Coty's poor earnings in part to the fact that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "[***o***]***ver the past couple of years***[.]" Defendant Mercier acknowledged that operational discipline with respect to over-innovation slipped across Coty "***over the past 2 years***" resulting, for example, in the number of SKUs in the CoverGirl innovation bundle almost doubling. Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," and that it was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference[,]" and that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf."

63. During the February 6, 2026 2Q2026 Earnings Call Q&A (defined below), Strobel admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.

64. Thereafter, on May 6, 2026, during the 3Q2026 Earnings Call Q&A (defined below), Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume, problem with it, if it doesn't sell out, it comes back in returns and obsolescence[,]" and that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

65. These admissions, that, over the past two years, *i.e.*, throughout the Class Period, Coty had continued to fund "too many projects and initiatives" and operational discipline had slipped, resulting in over 1,000 possible brand and market combinations and adversely impacting financial results, were in stark contrast to Defendants' consistent representations, throughout the Class Period, that Coty was focusing efforts and resources on "fewer and more impactful initiatives" and reallocating resources to the Company's core, most profitable "brands with the highest return on investment[.]"

### D. Coty's "Blockbuster" Hugo Boss Bottled Beyond Launch Did Not "Elevat[e]" the Brand or Create a "Halo Effect" as Represented

66. For months, Defendants teased the Hugo Boss Bottled Beyond launch as a historic event for Coty and primed investors on its critical importance. During Coty's August 20, 2025 4Q/FY2025 Pre-Recorded Earnings Call (defined below), Defendant Nabi announced the launch of Hugo Boss Bottled Beyond (launched in travel-retail on July 1, 2025 in the EMEA region and

in the Americas on August 1, 2025) and framed it as a "major" and "blockbuster" product launch in Coty's Prestige division, and the next day described it as "probably the biggest launch of the company's history."

67. Beginning November 5, 2025, Defendants claimed that the Hugo Boss Bottled Beyond launch was "elevating" the broader Hugo Boss brand, known in retail as the "halo effect[.]" However, later admissions revealed that the Hugo Boss Bottled Beyond launch in fact had not grown the Hugo Boss brand. On February 5, 2026, during the 2Q2026 Pre-Recorded Earnings Call (defined below), Strobel admitted that the Hugo Boss Bottled Beyond launch "did ***not*** translate into the growth of the broader Hugo Boss brand ***in the past 2 quarters***[,]" and on February 6, 2026, during the 2Q2026 Earnings Call Q&A (defined below), he admitted that the Hugo Boss Bottled Beyond launch had "***no halo effect***" on the Hugo Boss franchise.

## VI. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND GRADUALLY REVEALED THE TRUTH THROUGH PARTIAL DISCLOSURES[2]

68. Throughout the Class Period, Coty made materially false and misleading statements concerning (i) curtailing over-innovation and channeling resources to Coty's core profitable products consistent with Coty's All-in to Win program, and (ii) Hugo Boss Bottled Beyond's halo effect.

### A. False and Misleading Statements on May 6 and May 7, 2025

69. On May 6, 2025, after the stock market closed for trading, Coty published a press release announcing the Company's financial results for the three months (third fiscal quarter)

---

[2] All the statements that Plaintiffs allege are false and/or misleading are bolded and underlined (**<u>example</u>**) within this Section (VI). All other statements are included for context.

ended March 31, 2025 on its website and concurrently filed it with the SEC on Form 8-K, signed by Defendant Mercier ("3Q2025 Press Release"). For the quarter, Coty reported declines in net revenue, Prestige net revenue, Consumer Beauty net revenue, and gross margin.

70. In the face of the soft results, in the 3Q2025 Press Release, Coty represented that, aligned with the touted "All-in to Win" program, the Company was "rebalancing" resources toward the products that were the Company's "profit engines[:]"

> As part of FY25 being a transition year, both in Q3 and even more so in Q4, **Coty is continuing to clean the baseline including** assuring that retailer inventories are rightsized relative to the current demand trends, that the Company is **rebalancing our resources within Consumer Beauty to overdrive our profit engines** while scaling its cosmetics innovations, and that the business remains disciplined in its promotional activity to protect the health of its brands. All of these efforts are targeted to prepare for a gradual improvement in sales trends over the course of FY26, underpinned by multiple levers, including several major launches in both divisions, geographic and channel expansion, and incrementally higher pricing contribution. And at the same time, Coty is actively intervening in key areas of the business to set the Company on stronger footing into FY26 and beyond….

71. The statements identified in ¶70 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statement therein not false or misleading when made because Coty was not "rebalancing [its] resources" to "overdrive [its] profit engines" as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On August 21, 2025, Defendant Mercier partially admitted Defendants had seen the "slowdown" in the Consumer Beauty category "***probably a year ago***[,]" including "lower consumption" in the U.S.
- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "over ***1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."

- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.
- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

72. On May 6, 2025, Coty also released pre-recorded prepared remarks after the stock market closed for trading, wherein Defendants Nabi and Mercier reported on the Company's financial and operational results for its third quarter ended March 31, 2025 ("3Q2025 Pre-Recorded Earnings Call") and discussed the Company's operations.

73. During the 3Q2025 Pre-Recorded Earnings Call, Nabi assured investors that the Company was now more targeted with its product innovation and resources:

> **We are also step-changing our innovation impact by** identifying key launch priorities early in the process, and **focusing organizational efforts and resources into fewer and more impactful initiatives**, which will be supplemented by smaller agile launches to capture short-term opportunities[.]

74. The statements identified in ¶73 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statements therein not false or misleading when made because Coty was not focusing efforts and resources into "fewer and more impactful initiatives" as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On August 21, 2025, Defendant Mercier partially admitted Defendants had seen the "slowdown" in the Consumer Beauty category "***probably a year ago***[,]" including "lower consumption" in the U.S.
- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "over ***1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."
- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.
- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with

unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

75. On May 7, 2025, Coty held an earnings call before the stock market opened for trading, wherein Defendants Nabi and Mercier answered analyst questions in connection with the Company's financial and operational results for its third quarter ended March 31, 2025 ("3Q2025 Earnings Call Q&A").

76. During the 3Q2025 Earnings Call Q&A, Nabi responded to an analyst's questions about rebalancing resources and consumer innovations by, in relevant part, assuring "granularly decisive" efforts, to support the Company's most profitable brands, including in color cosmetics and fragrances, and away from initiatives and innovations that were not as profitable:

**Susan Kay Anderson**
*Canaccord Genuity Corp., Research Division*

I wanted to ask about the Consumer Beauty business. I think in your prepared comments you talked about rebalancing your resources to profit. Not sure if you meant just within Consumer Beauty or the whole portfolio, but just curious how you're thinking about CoverGirl, and if potentially you could sell that at some point? Or do you want to refocus your efforts here towards profitability and then some more consumer innovations, I believe you mentioned….

**Sue Y. Nabi**
*CEO & Director*
…
So on this side, **what we are doing on the color cosmetics part is that we are making our efforts even more granularly decisive**, meaning that we've made a lot of studies to understand what are the levers that can **support properly the brands with the highest return on investment**, which really allow us to free some resources to put them behind mass fragrances, which are, by the way, much more profitable with gross margins much higher than color cosmetics. **So that's the key shift that we are operating in this division**, **still continuing to do the right things behind color cosmetics**, while freeing investments to support what is growing and what is much more profitable for us, which is mass fragrances. …

> So at the end of the day, we feel that **<u>we are finding the right recipe</u>** to support color cosmetics with a little bit downsized investment while having better results, while reinvesting behind the mass fragrance category.

77. The statements identified in ¶76 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statements therein not false or misleading when made because Coty was not "granularly decisive" in supporting brands with the "highest return on investment" in color cosmetics and was not using "the right recipe" between color cosmetics and mass fragrances providing "better results" overall as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."
- On the same day, Defendant Mercier admitted that operational discipline slipped across Coty "***over the past 2 years***" resulting in the number of SKUs in the CoverGirl innovation bundle almost doubling.
- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 personally reviewed 2025 data confirming worsening Consumer Beauty sell-through trends and retailers reducing orders on products that were not selling and pushing back on inventory levels.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.

- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

78. Analysts relied on Defendants' statements concerning product innovation and resource allocation. For example, the May 8, 2025 Morningstar report maintained its Undervalued rating and cited Coty as "poised to tap prestige fragrance demands" and the Company's "brighter outlook for mass perfume as new products (such as body mist and pen spray) start gaining traction with consumers."

### B. Defendants Partially Disclosed the Truth on August 20 and 21, 2025

79. On August 20, 2025, after the stock market closed for trading, Coty published a press release announcing the Company's financial results for the three months and fiscal year ended June 30, 2025 on its website and concurrently filed it with the SEC on Form 8-K, signed by Defendant Mercier ("4Q/FY2025 Press Release").

80. The release reported that for 4Q2025 and the FY2025, Coty reported net revenue of $1.252 billion, representing an 8% decline on a reported basis from the prior year comparable quarter (including a 1% benefit from foreign exchange rates), and 9% decline on a LFL basis; and net revenue of $5.892 billion for FY2025, a 4% decrease from FY2024 (and a 2% decrease on a LFL basis). Coty reported operating income of $15.5 million for the fourth quarter, down from $34.7 million in the prior year comparable quarter; and operating income of $241.1 million for

FY2025, down 56% from FY2024. Prestige net revenue was $760.6 million (61% of Coty's sales) for the quarter, decreasing 5% on a reported basis and 7% on a LFL basis compared to strong 2024 results; and was $3.820 billion for FY2025 (65% of Coty's sales), down 1% on a reported basis but up "slightly" on a LFL basis compared to FY2024. Consumer Beauty net revenue for the quarter was $491.8 million (39% of Coty's sales), a decrease of 12% on both a reported and LFL basis over the prior year comparable quarter; and was $2.072 billion (35% of Coty's sales) for FY 2025, declining 8% on a reported basis and 5% on a LFL basis from FY2024. Quarterly reported and adjusted gross margin of 62.3% decreased 190 basis points year-over-year; for FY2025 reported gross margin of 64.8% improved 40 basis points, while adjusted gross margin of 64.9% increased by 50 basis points, over FY2024.

81. On August 20, 2025, Coty also released pre-recorded prepared remarks after the stock market closed for trading, wherein Defendants Nabi and Mercier reported on the Company's financial and operational results for its fiscal year ended June 30, 2025 ("4Q/FY2025 Pre-Recorded Earnings Call").

82. During the 4Q/FY2025 Pre-Recorded Earnings Call, Defendant Mercier admitted that Coty had analyzed the mass cosmetics category and attributed a slowdown therein to innovation fatigue among its consumers:

> The challenges of fiscal year '25 coincided with moderating growth in the broader beauty market. Prestige fragrance growth has moderated gradually from exceptional growth in prior years, though market trends are incrementally stronger in Q4 compared to Q3. The mass cosmetics category saw a sharper category slowdown from high single-digit percentage growth in fiscal year '24 to mid-single-digit percentage decline in Q3 and low single-digit percentage decline in Q4. ***Our analysis of cosmetics category weakness points to value-seeking behavior, some fatigue with innovation*** as consumers circle back to basics and less frequent usage, particularly with Gen Z migrating to fragrances.

83. On August 21, 2025, Coty held an earnings call before the stock market opened for trading, wherein Defendants Nabi and Mercier answered questions in connection with the Company's financial and operational results for its fiscal year ended June 30, 2025 ("4Q/FY2025 Earnings Call Q&A").

84. During the 4Q/FY2025 Earnings Call Q&A, Nabi responded to an analyst's question regarding Coty's investments in mass color cosmetics by admitting that a subset of customers were experiencing "innovation fatigue" and had been "lost in translation[:]"

> **Olivia Tong Cheang**
> *Raymond James & Associates, Inc., Research Division*
>
> Since you touched on it, I do want to talk a little bit about Consumer Beauty. First, around the mass color side. Just your commentary from last night's prepared remarks around the evolution of investment levels, particularly in mass color and how you're thinking about levels of investment this year versus last year and then going forward?...
>
> **Sue Y. Nabi**
> *CEO & Director*
>
> So yes, on the first part, Olivia, which is around how we are going to invest behind ***our color cosmetics category***. Indeed, I think the tone is clear. This is the year of increasing the profitability of this business, and in fact, this was not just a decision driven by the P&L, even if the P&L is clearly telling us to go in this direction.
>
> But it's also driven by what we learned throughout the 2025 year, where we realized that maybe, I would say, the move from traditional media to mainly advocacy, marketing was a little bit too radical for a brand like CoverGirl. ***So what we are realizing is that this market and including the dynamics of the markets are today hurt by and this is interesting to hear, innovation fatigue, this is something we hear***, and simplification of routines.
>
> These are the things we learned from the recent studies we have made. ***I think a lot of loyal consumers, above 30 years old consumers got lost in translation given the complexity of this category today***. A lot of people don't know the difference between an ink, between a butter, between a balm, between a liquid lip color, between a bullet lip color and the list goes on.…

85. Another analyst pressed further on "innovation fatigue" and Nabi acknowledged that Coty had felt pressure to do "more and more launches" which lost some customers:

> **Sydney A. Wagner**
> *Jefferies LLC, Research Division*
>
> … Can you just elaborate a little bit more on the comment on innovation fatigue? I think on the February earnings call, you called out kind of seeing a lack of innovation in color in mass, I believe. So is it feeling like the market got flooded in the last 6 months-or-so. And then just curious, are you only seeing that in color? Is that happening at all in Prestige?
>
> And then on promotion, just can you share how that varies between channels and then how that trended throughout the quarter and what you're seeing quarter-to-date?
>
> **Sue Y. Nabi**
> *CEO & Director*
>
> … ***So regarding the topic of innovation fatigue***, which is one of the reasons why the market is not as dynamic as it used to be. You have to couple it also with the simplification of makeup routines, which more or less tells the same story. ***I think this is something that started maybe 18 months ago*** and that peaked recently with the inflation of launches.
>
> Indeed, ***we all felt that we need to do the race and do more and more launches*** from TPMs in as quickly as 2 months with new galenics, new routines, new makeup finishes, et cetera. ***And in fact, the result is that a lot of consumers got lost in translation, specifically, those above 25 to 30 years old***. This we heard it in the consumer studies we have conducted during this first half of fiscal 2025.…

86. During the same exchange, Mercier elaborated that Defendants had seen the "slowdown" in the Consumer Beauty category "probably a year ago[,]" including "lower consumption" in the U.S.:

> **Laurent Mercier**
> *Chief Financial Officer*
>
> Yes. On promotions, I would say that indeed, I mean, ***we saw this starting on Consumer Beauty and color cosmetic, probably a year ago***. And of course, it's also ***related to the slowdown of the category***. So there is always this kind of

> mechanical reaction that ***lower consumption*** and this is especially what we saw in the U.S.
>
> And then it's creating this kind of tension on promotion and as we just explained also linked to some innovation fatigue. So this is really what created this pattern on color cosmetics…

87. On August 21, 2025, after Defendants' partially corrective disclosures, and additional false statements, the price of Coty's common stock declined, on unusually heavy trading volume, from a closing price of $4.86 per share on August 20, 2025, to an intraday low of $3.75 per share, and hitting a high of $3.96 per share, before closing at $3.81 per share that day.

88. Had Defendants not accompanied their partial disclosures with false and misleading statements designed to reassure investors, or had they disclosed the true extent of the adverse facts, the market price of Coty stock would have fallen even lower.

89. As alleged in further detail in the "Loss Causation" section below (Section IX), market analysts reacted to Defendants' disclosures with downgrades and/or commentary attributing the shortfalls to the very subject areas of Defendants' alleged false and misleading statements during the Class Period, including Coty's over-innovation and related misallocation of resources.

### C. Continued False and Misleading Statements on August 20 and 21, 2025

90. On August 20, 2025, during the 4Q/FY2025 Pre-Recorded Earnings Call, Defendants sought to immediately counter any concerns from the acknowledgement of customer "fatigue with innovation[.]" Indeed, Nabi claimed that, in Consumer Beauty, Coty had a "more disciplined profit-driven approach to color cosmetics" and was benefitting its core products in fragrances where "margins are strongest":

> …. As part of this sharpened focus with Consumer Beauty, **we are taking a more disciplined profit-driven approach to color cosmetics by rebalancing resources towards higher return focused opportunities**.
>
> This shift will unlock additional funds to reinvest in our more profitable fragrances business to further accelerate our growth. **By focusing on our most loyal and profitable categories, we are fueling areas where** we lead, **margins are strongest** and long-term value creation is highest….

91. The statements identified in ¶90 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statement therein not false or misleading when made because Coty was not taking a "more disciplined profit-driven approach" in color cosmetics "by rebalancing resources towards higher return focused opportunities" or focusing on the "most loyal and profitable categories" in fragrances as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."
- On the same day, Defendant Mercier admitted that operational discipline slipped across Coty "***over the past 2 years***" resulting in the number of SKUs in the CoverGirl innovation bundle almost doubling.
- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 personally reviewed 2025 data confirming worsening Consumer Beauty sell-through trends and retailers reducing orders on products that were not selling and pushing back on inventory levels.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced

across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.

- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

92. On August 21, 2025, after the stock market closed for trading, Coty filed its Form 10-K with the SEC reporting on the Company's financial and operational results for its fiscal year ended June 30, 2025 (the "FY2025 Form 10-K"), which was signed by Defendants Nabi and Mercier.

93. The FY2025 Form 10-K represented, in the section entitled "Item 1. Business[,]" that the Company was strategically expanding its product footprint in a "limited number of structurally profitable" beauty areas:

> …We will **continue expanding our presence in a limited number of structurally profitable and growing beauty categories**, in growth channels such as e-commerce and the Travel Retail channel, all while establishing Coty as an industry leader in sustainability.

94. The statement identified in ¶93 above was materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statement therein not false or misleading when made because Coty was not pursuing a "limited number" of "profitable and growing" product categories as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On August 21, 2025, Defendant Mercier partially admitted Defendants had seen the "slowdown" in the Consumer Beauty category "***probably a year ago***[,]" including "lower consumption" in the U.S.
- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."
- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.
- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

95. During the 4Q/FY2025 Earnings Call Q&A, Defendant Nabi responded to an analyst's question about Coty's mass fragrance category outlook by assuring there was "absolutely no dilution" to the Company's product offerings:

**Olivia Tong Cheang**
*Raymond James & Associates, Inc., Research Division*

> … And then on mass fragrances, you just mentioned that, that's a bright spot. How do you think about this business over time, like both as a percentage of sales, the opportunity to grow this, the ability to differentiate relative to others in the category and effectively, who the audience is for that?
>
> **Sue Y. Nabi**
> *CEO & Director*
>
> … **Now when it comes to the fragrance, the mass fragrance category**, this is more or less 7% of the net revenues of the company. It's been growing nicely. The market is growing everywhere around the world. And this is part of what we used to call the fragrance index. But I think today, we are more into what we call the treatonomics phenomenon, which is the economy of treats.
>
> And we see that the fragrances from $5 to $500 are becoming really the go-to destination in the beauty industry hence, I would say, the dynamism of this category. And this explains why a lot of consumers today are continuing to buy fragrances at every price level, including in mass fragrances.
>
> They are also diversifying the way they wear fragrances, hence, our perfume mist attack. And this category, I know you wrote recently about the profitability potentially of this category. It's for us, it's as profitable as a fragrance launch. **So there is absolutely no dilution play in this game**.
>
> And we see this game because it's a game of layering. **We see this game as a purely additional.** It's an $8 billion market, doubling year-on-year. And this is an area where Coty, which is the leader in scenting and in fragrances at large should play in. So we are playing big. And we believe this is going also to help us in the second half of the year.

96. The statements identified in ¶95 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statements therein not false or misleading when made because Coty's new mass fragrance products were not "purely additional" with "absolutely no dilution" to the mass fragrance category as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market

combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."

- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.
- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

97. Similarly, when a Jefferies analyst asked for further detail on the innovation fatigue Coty had mentioned, Defendant Nabi replied by downplaying the issue as isolated and wholly inapplicable to fragrances:

> **<u>We don't see something similar [innovation fatigue] at all in fragrances</u>** simply because the market of fragrances is still quite simple. You have mist, which is becoming, for me, like a kind of modern eau de cologne which is generous content, easy-to-wear, not overwhelming, easy to pair it with something else and then entry fragrances and then niche fragrances.

98. The statement identified in ¶97 above was materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statement therein not

false or misleading when made because innovation fatigue was manifest in fragrances as well, as evidenced by the facts alleged herein, including Defendants' own admissions and CW accounts:

- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."
- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.
- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.
- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

99. Analysts continued to rely on Defendants' misstatements. For example, the August 22, 2025 RBC Capital Markets report maintained its Outperform rating for Coty's stock, citing Prestige sell-out and stating that "many of the factors leading to the recent underperformance were out of the company's hands[.]" The analysts cited the success of Coty's new product launches as

"a catalyst for growth[,]" including "several blockbuster launches" in Prestige and Consumer Beauty.

100. The August 21, 2025 Deutsche Bank report credited Defendants' diagnosis of the FY2025 underperformance, noting that the issues identified, including concerning product innovation and investment, were "fixable[.]" Indeed, the Deutsche Bank analysts stated that "we believe the company is ***now prioritizing the right initiatives*** by which to return the portfolio to LFL sales and EBITDA growth in FY2H26 (including investments in performance measurement and operational excellence)."

### D. False and Misleading Statements on November 5 and 6, 2025

101. On November 5, 2025, after the stock market closed for trading, Coty published a press release announcing the Company's financial results for the three months ended September 30, 2025 on its website and concurrently filed it with the SEC on Form 8-K, signed by Defendant Mercier ("1Q2026 Press Release").

102. In the 1Q2026 Press Release, Coty claimed that its much-touted launch of the Hugo Boss Bottled Beyond (Prestige) fragrance was "unlocking a significant untapped opportunity" for the Hugo Boss brand in general in the U.S. market—often known in retail as the "halo effect":

> We continue to build on our multi-year track record of leading fragrance innovations. **BOSS Bottled Beyond** is currently on track to be the #2 male fragrance launch of the fall in Europe, the #1 male launch by volume in Germany, and the #1 male SKU in Australia, and **is unlocking a significant untapped opportunity for Hugo Boss in the U.S. market**, where the brand historically had limited presence.

103. The statement identified in ¶102 above was materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statements therein not false or misleading when made because the Hugo Boss Bottled Beyond launch was not "unlocking

a significant untapped opportunity" for the Hugo Boss brand in the U.S. as evidenced by the facts alleged herein, including Defendants' own admissions:

- On February 5, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch "did not translate into the growth of the broader Hugo Boss brand in the past 2 quarters."
- On February 6, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch had "no halo effect on the core" of the Hugo Boss franchise.

104. On November 5, 2025, Coty released pre-recorded prepared remarks after the stock market closed, wherein Defendants Nabi and Mercier reported concerning the Company's financial and operational results for its first quarter ended September 30, 2025 ("1Q2026 Pre-Recorded Earnings Call").

105. During the 1Q2026 Pre-Recorded Earnings Call, Defendant Nabi again assured investors that Coty's Hugo Boss Bottled Beyond launch was driving growth across the wider Hugo Boss brand—the "halo effect"—stating, in relevant part, that:

> [W]e continue building on our multiyear track record of leading fragrance innovation. Our **BOSS Bottled Beyond launch** is already resonating with consumers across markets. I'm very excited to share that BOSS Bottled Beyond is on track to be the #2 male fragrance launch of the fall in Europe, including the #1 male fragrance launch in Germany in units and the #1 male SKU in Australia.
>
> **The launch is elevating the Hugo Boss brand equity, strengthening our position in male fragrances** and unlocking a significant opportunity in the U.S. where Boss Bottled Beyond is already the #6 innovation despite limited historical presence.

106. The statements identified in ¶105 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statements therein not false or misleading when made because they denoted a halo effect permeating out from the Hugo Boss Bottled Beyond fragrance, when in reality the launch was not "elevating the Hugo Boss

brand equity" or benefitting "fragrances" (plural), as evidenced by the facts alleged herein, including Defendants' own admissions:

- On February 5, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch "did not translate into the growth of the broader Hugo Boss brand in the past 2 quarters."
- On February 6, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch had "no halo effect on the core" of the Hugo Boss franchise.

107. Later during the same call, Defendant Nabi highlighted that Coty's Consumer Beauty leadership was "streamlining" core innovation as Defendants had previously assured investors Coty was doing:

> A pivotal role within the new Consumer Beauty leadership team is our new EVP of Global Brands and New Product Development, who previously led the Kylie Cosmetics business and helped drive brand growth by over 30% in the last 2 years. She is **streamlining core innovation to focus on fewer high-impact initiatives** while complementing with trend-driven launches. The team is actively shaping the color cosmetics transformation program….

108. The statement identified in ¶107 above was materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statement therein not false or misleading when made because Coty was not "streamlining core innovation" or focusing on "fewer high-impact initiatives" as evidenced by the facts alleged herein, including Defendants' own admissions and accounts of CWs:

- On February 5, 2026, Strobel admitted that, across both Prestige and Consumer Beauty, Coty had "funded too many projects and initiatives" "***[o]ver the past couple of years***[.]" Indeed, Strobel admitted Coty had "***over 1,000*** possible brand and market combinations," and that Coty was releasing "too many new assets across too many brands and too many markets[,]" as a result of which "we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference."
- CW1 confirmed that, during the Class Period, Coty had an excessive number of SKUs, innovations, and initiatives that did not materially affect results, and stated that Coty's U.S. leadership, including CFO of the Americas Leah Zavlowsky, Alex Botero, Senior VP-Sales Prestige, and Dimitri Foutres, Senior VP of Sales and Trade Marketing, expressed concern internally within Coty about excessive product launches.

- CW1 stated that frequently shifting priorities made it difficult to allocate marketing resources effectively across numerous launches and brands. According to CW1, beginning in calendar year 2024 and during 2025, Coty was underinvesting in successful core products, like Gucci fragrance, Marc Jacobs Daisy, several Gucci Flora lines, Kylie fragrance, and Burberry Her, because marketing spend was being reduced across the business to preserve Coty's internal margin targets. CW1 recalled that Zavlowsky, Botero, and Foutres wanted more spend behind Coty's core brands, but that additional spend did not happen because of the Company mandate to preserve margins.
- On February 6, 2026, Strobel admitted that "we had gigantic innovation bundles with lots of SKUs [] -- most of them didn't work and they crowded out productive SKUs on the shelf." Strobel also admitted that Coty had just "started" to "focus on our most iconic assets" "in the last couple of weeks," and would have "smaller sharper [product] bundles" in the future.
- On May 6, 2026, Strobel admitted that, only "in the Q3 [2026]," Coty "changed our strategy" to focus on "much slimmer, much sharper bundles because … in the past, we sold in very big bundles, a lot of volume," but the "problem with it" was that it would "come[] back in returns and obsolescence" because customers were overwhelmed with unpopular SKUs, that Coty was "still suffering from the hangover" of returns and obsolescence and that "Q3 was the first time where we are breaking that cycle."

109. On November 6, 2025, Coty held an earnings call when the stock market opened for trading, wherein Defendants Nabi and Mercier answered questions in connection with the Company's financial and operational results for its first quarter ended September 30, 2025 ("1Q2026 Earnings Call Q&A").

110. During the 1Q2026 Earnings Call Q&A, Defendant Nabi responded to an analyst's question about what was driving her commentary on better performance in 2Q2026 by, in part, emphasizing the Hugo Boss Bottled Beyond launch:

> **Filippo Falorni**
> *Citigroup Inc., Research Division*
>
> Sue, maybe can you comment a bit about the better performance that you're seeing in fiscal Q2 that is driving you to the higher end of the range? Are you seeing an acceleration in some category growth?...
>
> **Sue Y. Nabi**
> *CEO & Director*

> So on the first question regarding the better performance that we are contemplating for Q2, which led to our increase in terms of being at the more favorable part of the guidance for Q2. I would say that it's a mix of everything, in fact, the dynamism of the fragrance market in the U.S. continues to be very strong. Again, we are talking about a market that's in the mid-single-digit growth. And what we see in Q2 in terms of market dynamics is confirming this element. So we believe it's going to be a good holiday season. This is number one. **Number two, our innovations, specifically the BOSS Bottled Beyond launch** that started at the end of the Q1, more or less, and it was exclusive to Travel Retail during this summer until the end of August. So it all started in domestic markets around the end of September. **This is such a big success** that I believe it's going to translate into a stronger selling also for Q2….

111. Defendant Nabi also responded to an analyst's question about key product launches and growth in the second half of FY2026 by again emphasizing the Hugo Boss Bottled Beyond launch and its effect as "continu[ing]":

> **Oliver Chen**
> *TD Cowen, Research Division*
>
> [A]s we are excited about the second half here, what are your thoughts in terms of the key launches and how you'll think about categories and the comparisons as well that will give that return to that growth in the second half….
>
> **Sue Y. Nabi**
> *CEO & Director*
>
> …. So indeed, about H2, and indeed, we are confirming that we will be back to growth in the second half of this fiscal. So that's the #1 message. So what is behind this number is that indeed, the continuing momentum on the beauty category and especially of the Prestige fragrance category. So we see really consistent, resilient growth of this category….
>
> Now we are really already in a good place that we are recovering very fast. So that's really the big element. It's going to be amplified by strong innovation. So as you heard and as you saw, I mean, **BOSS Beyond Bottled is off a very good start**. And **of course, it's going to continue** and amplify. And we are coming also in the second half with an additional blockbuster. So again, the fundamentals of this growth are here.…

112. The statements identified in ¶¶110-111 above were materially false and misleading, lacked any reasonable basis, and/or omitted material facts necessary to make the statements therein not false or misleading when made because Defendants misleadingly portrayed Hugo Boss Bottled Beyond as a headline product that was presently lifting the entire Prestige category's performance when it was actually failing to generate any halo effect beyond the single fragrance being launched, as evidenced by the facts alleged herein, including Defendants' own admissions and statements from CWs:

- On February 5, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch "did not translate into the growth of the broader Hugo Boss brand in the past 2 quarters."
- On February 6, 2026, Strobel admitted that the Hugo Boss Bottled Beyond launch had "no halo effect on the core" of the Hugo Boss franchise.

113. Analysts relied on Defendants' statements touting the Hugo Boss Bottled Beyond launch and Coty's innovation. For example, the November 6, 2025 Morningstar report affirmed its Undervalued rating and projected growth in FY2026 Prestige sales, citing the Hugo Boss launch. On November 7, 2025, Santander Bank published a report reiterating its Outperform rating based on "Coty's positioning in the fast-growing fragrance segment, coupled with relentless execution and innovation…."

**E. Defendants Finally Disclose the Truth on February 5 and 6, 2026**

114. On February 5, 2026, after the stock market closed, Coty issued a press release announcing financial results for the three months ended December 31, 2025 on its website and concurrently filed it with the SEC on Form 8-K, signed by Defendant Mercier ("2Q2026 Press Release"). Contrary to Defendants' positive statements during the Class Period, the 2Q2026 Press Release announced poor quarterly financial results, including insufficiently focused investments and prioritization in Coty's core products. Among other things, Coty reported that:

- "2Q26 reported operating income of $148.2 million decreased from $268.2 million in the prior year, driven by lower gross profit. 2Q26 reported operating margin was 8.8%, compared to 16.1% in the prior year";
- "Fiscal year-to-date reported operating income of $333.2 million declined from $506.0 million in the prior year. Fiscal year-to-date reported operating margin was 10.2%, down from 15.1% in the prior year"; and
- "[f]iscal year-to-date reported and adjusted gross margin of 64.1% decreased 200 basis points year-over-year, reflecting lower sales, the continued more promotional environment, and the impact from tariffs."

By region, Coty reported that:

**Americas**

- "In 2Q26, Americas net revenue of $624.5 million, representing 37% of the Company's total sales, ***decreased 2% on a reported basis***. ***The decline was driven by lower reported net revenue in both Prestige and Consumer Beauty***, partially offset by a 1% FX benefit. On a LFL basis, Americas net revenue decreased by 3% in the quarter. On a fiscal year-to-date basis, Americas net revenue of $1,274.1 million decreased 4% on a reported basis and 5% on a LFL basis. The reported net revenue decline in both periods reflected lower Prestige net revenue as a result of elevated promotional activity, the estimated headwind from retailer destocking, which was significantly reduced in the quarter, and an inconsistent recovery in the Company's market share in U.S. ***prestige fragrances***, as well as ***lower Consumer Beauty net revenue in U.S. cosmetics*** driven by the sell-out gap to the category."

**EMEA**

- "In 2Q26, EMEA net revenue of $864.2 million increased 3% on a reported basis and included a 7% FX benefit. On a LFL basis, EMEA ***net revenue decreased by 4% in the quarter*** driven by ***lower net revenue in the Prestige fragrance and Consumer Beauty color cosmetics businesses***. On a ***fiscal year-to-date*** basis, EMEA net revenue of $1,619.0 million decreased 1% on a reported basis and ***7% on a LFL basis***. The decline in reported net revenue was ***driven by lower Consumer Beauty net revenue***."

115. Concerning the outlook for Q3, Coty added that it "expects LFL Q3 revenues to decline by a mid-single-digit percentage, primarily due to weakening in Consumer Beauty sales trends[,]" and that "***Coty is refining its investment allocation behind key priorities***…" However, due to the strategic changes required by such poor results and missteps, Coty stated that it was withdrawing FY2026 guidance for EBITDA and free cash flow.

116. The 2Q2026 Press Release quoted interim CEO Strobel as acknowledging that "our financial performance over the past year and a half has been disappointing" and "we have not been delivering at the level we should." Strobel added that "To step-change our performance and channel our strengths, we are initiating our 'Coty. Curated.' strategic framework, encompassing ***sharper priorities, more focused investments***, improved execution, and ***increased support behind our core businesses***."

117. On February 5, 2026, Coty also released pre-recorded prepared remarks after the stock market closed for trading, wherein Strobel and Defendant Mercier reported on the Company's financial and operational results for its second quarter ended December 31, 2025 ("2Q2026 Pre-Recorded Earnings Call") and discussed the Company's operations.

118. During the 2Q2026 Pre-Recorded Earnings Call, in discussing the reasons for Coty's 2Q2026 poor earnings results, Strobel admitted in more detail that, despite prior assurances of fewer and more impactful product initiatives, dating back to May 2025, Coty still had too many new product initiatives and, in truth, was just then refocusing:

> Let me illustrate how complexity quietly dilutes impact. Today, at Coty, we sell more than 40 brands across dozens of markets. ***This results in over 1,000 possible brand and market combinations, highlighting the significant complexity we manage***. The risk is clear. When resources are stretched across too many permutations, our core brands may not get the consistent, concentrated support they need. This manifests in the following ways: Without adequate support, our top initiatives don't reach their full potential in the markets that matter most, the largest, highest growth potential markets where impact should be the greatest.
>
> The creativity of the Coty organization is amazing, and we can create beautiful and cutting-edge assets. ***But too often, we create too many new assets across too many brands and too many markets***. A disproportionate amount of our spending gets tied up in asset creation, and not enough flows into working media and consumer engagement, which can lead to insufficient awareness, trial and purchase. And finally, strong year 1 initiatives may often lack sufficient year 2 support because

> ***we are allocating too many resources to new product launches. So many activities, so many projects, but very few make a real difference***.
>
> So how do we break this cycle? We will place a much stronger focus on our top markets, brands and initiatives, ensuring they are sufficiently funded and grow year after year. ***We will refocus investment on the core, ensuring that the more supports the core through built-in halo effects***. These insights are not revolutionary, but they are fundamental to every beauty and consumer business that delivers long-term success. Fewer assets, better execution, bigger propositions and more supporting the core. We will share more details about Coty. Curated. in the coming quarters.…

119. During the same earnings call, and in direct contrast to Defendant Nabi's prior representations, Strobel admitted that the Hugo Boss Bottled Beyond launch did not grow the Hugo Boss brand ***in the past 2 quarters*** (*i.e.*, admittedly starting in the Defendants' statements in the 1Q2026 Press Release, the 1Q2026 Pre-Recorded Earnings Call, and the 1Q2026 Earnings Call Q&A):

> Let me share a few examples of what this looks like in practice, focused on our biggest brands and biggest markets. ***It's only fitting to begin with Hugo Boss***. Hugo Boss is Coty's biggest brand in the portfolio…
>
> BOSS Bottled Beyond, launched this past fall, is a top-notch innovation and is already ranking as the #2 innovation in key markets. Its strong momentum has driven market share gains for the iconic BOSS Bottled franchise in all major markets….
>
> These achievements highlight the strength of Coty's innovation, creativity and marketing capabilities. ***But without sufficiently strong operational discipline, the success of BOSS Bottled Beyond did not translate into the growth of the broader Hugo Boss brand in the past 2 quarters. The launch did not generate enough halo impact on the other core Hugo Boss franchises*** like BOSS The Scent. This is not rocket science, which is why we are putting in place a more holistic plan for next year with continued support and co-merchandising around BOSS Bottled Beyond, a broader brand level halo strategy and sustained reinforcement of the core business.

120. Later during the same call, and in direct contrast to Defendant Nabi's representations of more focused and disciplined product investments, Strobel admitted Coty had been doing the exact opposite ***over the past couple of years***:

> The root cause of this underperformance comes back to the same themes: focus, making choices, prioritizing investment and operational discipline. ***Over the past couple of years, in both Prestige and Consumer Beauty, Coty has funded too many projects and initiatives***. As a result, high potential core franchises didn't receive sufficient investment or organizational focus. Too much emphasis was placed on launching new innovation, and not enough on the core business. The challenge was most acute in mass cosmetics, where our SKU count in seasonal innovation bundles kept increasing, resulting in ***less productive SKUs replacing more productive SKUs on the shelves***, in addition to incurring more costs from returns.

121. In direct contrast to Defendant Nabi's representations of focused and careful investments in mass fragrances, Strobel also admitted that Coty had so many small and complex mass fragrance projects that the Company had to discontinue and halt them:

> Moving to our ***mass fragrance business***. The broader Coty issue of ***pursuing too many small projects, adding complexity without moving the needle, is also evident here***. Smaller lifestyle fragrance initiatives ***have diverted focus and resources from core brands***, reinforcing the need to focus and streamline the portfolio. We will discontinue small fragrance initiatives and halt new projects that have been in development, particularly as many of these projects did not resonate with retailers and consumers.

122. Defendant Mercier confirmed that Coty was just then reinvesting in key icons and acknowledged that product innovation issues pervaded Coty due to SKU proliferation and operation discipline slipping ***over the past 2 years***:

> ***Next steps in the coming months include reinvesting behind key icons***, activating evolved brand equities, leveraging AI to scale content creation at a fraction of the cost and reexamining the full value chain. It is worth noting that some of these actions were part of our Consumer Beauty turnaround 5 years ago, including revamping brand equities, platforming innovation and streamlining SKU count.

> While these interventions helped stabilize and grow Consumer Beauty several years ago, ***operational discipline has slipped across the organization over the past 2 years***. For example, ***the number of SKUs in our annual CoverGirl innovation bundle has almost doubled in recent years***, significantly increasing cost. We have already materially reduced the SKU count in the fiscal year ‘26 spring innovation bundle to focus on the highest potential launches. And our fiscal year ‘27 plans include further streamlining in the CoverGirl innovation SKU count. With Gordon leading end-to-end, ***the goal is to reinstate the operational discipline*** and introduce more transformational full value chain change so that progress is durable.

123. On February 6, 2026, Coty held an earnings call before the stock market opened for trading, wherein Strobel and Defendant Mercier answered analyst questions in connection with the Company’s financial and operational results for its second quarter ended December 31, 2025 (“2Q2026 Earnings Call Q&A”).

124. During the 2Q2026 Earnings Call Q&A, Strobel responded to an analyst’s question about the relationship between fragrance innovation and the breadth of Coty’s fragrance portfolio by again admitting that the Hugo Boss Bottled Beyond launch did not have a halo effect on the core Hugo Boss brand:

> **Sunil Harshad Modi**
> *RBC Capital Markets, Research Division*
>
> … [N]ewness is so important in fragrances. How does that kind of -- does that conflict with this whole notion of kind of streamlining the complexity of the portfolio?
>
> **Markus Strobel**
> *Executive Chairman & Interim CEO*
>
> Yes. No, not necessarily. I think newness -- let[’s] understand what newness is in fine fragrances. People love it when you -- they like to experiment, they like to layer in. So of course, you're going to come up with new propositions. But the new propositions need to be tailored in a way that drives total portfolio or the total brand. I’ll give you one example. We’ve launched Boss Bottled Beyond in summer. That’s a pretty successful initiative. It’s the #2 male initiative of the year….

> ***Problem is our Hugo Boss franchise in total is not growing. So the innovation is great, but it has no halo effect on the core***. And often what happens is you bring in a new innovation, many SKUs, it's pretty cool. Everybody sells the innovation and then we're losing shelf space on SKUs that are loved by consumers and are fast rotating, right? So that is something we need to avoid in the future and be much more surgical, how we bring our innovation to market and also how do we build in a halo effect, right?
>
> So that if you launch one, it halos on the other by joint merchandising or there's tons of other things that we can do. So yes, innovation is the lifeblood of this category, but innovation executed in a way that it has an effect on the core. ***So if I do a Boss Bottled Beyond, I want it to grow the total Hugo Boss franchise and not only the innovation itself***. And we are applying this discipline, this logic, this idea of building in halo effects into innovation in everything that we do. And I think that should have a pretty strong effect moving forward.

125. Later during the same call, Strobel responded to another analyst's question about the status of Consumer Beauty's product initiatives by acknowledging that (in direct contrast to Coty's representations, dating back to April and May 2025, that the Company was doing "fewer and more impactful initiatives"), in just ***the last couple of weeks***, Coty had focused on key assets and there would be sharper and smaller product bundles in the future:

> **Filippo Falorni**
> *Citigroup Inc., Research Division*
>
> Markus, maybe can you give us a bit more color on the Color the Future performance improvement plan for Consumer Beauty. You mentioned in the prepared remarks yesterday that there's a lot of different initiatives commercially, including streamlining the portfolio. What are you thinking those potential impacts are going to be on sales near term and then a little bit longer term?...
>
> **Markus Strobel**
> *Executive Chairman & Interim CEO*
>
> All right. Thanks, Filippo. I'll take that on. There's about 3 or 4 principles how we are addressing the consumer business priorities and focus on our business building plan. It's imperative for us to get back to sell-out growth and to market share growth. We've got to be the masters of our destiny and win in the market. That's our ambition.

> Now how we're going to do that? Number one, ***we're going to focus on our most iconic assets***. These are brands like CoverGirl, where we have assets in there like Lash Blast, Simply Ageless and iconic brands like Rimmel. ***We started doing this in the last couple of weeks***, and I'm very encouraged by the early results. We have seen declines on these franchises in the high single digits. Now they went down to the low single digit to the mid-single digits. So it's nothing to write home about, nothing that we are happy about, but ***we're going to see the power of focus on the key assets***.
>
> Number two, you know that cosmetics is driven very much by the big innovation bundles that come in spring. In the past, ***we had gigantic innovation bundles with lots of SKUs that kind of -- most of them didn't work and they crowded out productive SKUs on the shelf***. So you've had kind of the double whammy and you got returns from the trade. So we're avoiding this. ***We're going to bring our first bundle in fiscal '26, which is sharper, streamlined*** with better SKUs, fast rotation and will also protect our existing fast rotating SKUs on the shelf.
>
> This leads me to the question you had, when do we see sellout. Obviously, if we sell in a smaller bundle, we're going to see initially less pipeline fill, and you're going to see this in Q3. But the focus we're getting with this and the sellout velocity on the shelf will improve sell-out as we go along and hopefully get our business back on track. That's number two.
>
> Number three is that we -- when we do these big bundles and these big advertising campaigns, we have a lot of money on asset creation. But we have very little money to -- in what we call working ACP, wonderful assets to the consumers in digital, in advocacy via influencers and so on and so on and so on. ***So by having smaller sharper bundles, we're going to*** free up asset creation money, put it into working media.…

126. Finally, in yet another analyst exchange, Strobel again acknowledged that, contrary to Defendants' Class Period claims, Coty had lacked the "operational discipline" to bring products to market in a properly "sequenced," "properly funded" and "thought through" way instead of simply being "so excited about our innovation":

> …***What we are missing a bit is the operational discipline*** to bring this to market ***in a way that is sequenced, that is properly funded and that is well thought through*** in agreements return in the plans we go to market.
>
> ***We are often so excited about our innovation that we are focusing on the sell-in***, right, which is good for a quarter or 2, but what we got to focus on is the sell-out.

> How does it reach the consumer? Does it meet the consumer needs? … [W]e've got to start from the sell-out from the consumption, from the market shares. ***That's the big switch that we're going to do***.
> … ***It's very hard to do, to change the mindset of the organization on this one and put the processes in***….

127. On February 6, 2026, in response to Defendants' corrective disclosures, the price of Coty's common stock fell sharply, declining from a closing price of $3.15 per share on February 5, 2026 to an intraday low of $2.44 per share (a decline of 22.5%), before closing at $2.66 that day (a decline of 15.6%), on unusually heavy trading volume.

128. As alleged in further detail in the "Loss Causation" section below (Section IX), market analysts reacted to Defendants' disclosures with downgrades and/or commentary attributing the shortfalls to the very subject areas of Defendants' alleged false and misleading statements during the Class Period, including Coty's over-innovation and related misallocation of resources and inability to generate the claimed "halo effect" for major launches, *i.e.*, Hugo Boss Bottled Beyond.

## VII. POST-CLASS PERIOD ADMISSIONS

### A. May 6, 2026 3Q2026 Earnings Call Q&A

129. On May 6, 2026, Coty held an earnings call before the stock market opened for trading, wherein Defendant Mercier and Interim CEO Markus Strobel answered questions about the Company's financial and operational results for its third quarter ended March 31, 2026 ("3Q2026 Earnings Call Q&A").

130. During an analyst exchange about drivers of sales performance in Prestige and Consumer Beauty, Strobel admitted that Coty had sold "very big bundles" and had just—in Q3—changed the actual strategy to focus on "sharper bundles":

**Filippo Falorni**
*Citigroup Inc., Research Division*

First question, Markus, I was hoping you can elaborate on the sell-in versus sellout gap that you called out yesterday, both for Prestige and Consumer Beauty, different drivers there. But how should we think about it going forward into Q4 and as you start thinking about fiscal '27?...

**Markus Strobel**
*Executive Chairman & Interim CEO*

…Now why have we not seen this in the sell-in? There is basically multiple reasons behind this. #1, we have basically decided to get our whole organization focused on sellout and market share. This is for us, a big cultural shift. ***So in the Q3, we sold in much slimmer, much sharper bundles*** because you sell in a big -- ***in the past, we sold in very big bundles, a lot of volume***, problem with it, if it doesn't sell out, it comes back in returns and obsolescence.

***We avoided it this time***. So we sold in less but we sold through much, much more. That's how we got up against the category. So this is a short-term effect of selling in less because ***we changed our strategy in the way we drive retail productivity***…. So we believe that long term, ***the focus on sellout and the sharper bundles and much more retail productivity*** will make us a stronger company. And over time, sell-in -- sellout will equal sell-in.

131. Indeed, in response to an analyst's question on the status of the Company's SKU rationalization, Strobel admitted that Coty was "still suffering from the hangover" of returns and obsolescence resulting from large innovation bundles crowding out productive SKUs:

**Andrea Faria Teixeira**
*JPMorgan Chase & Co, Research Division*

Markus, you and Laurent, you both talked about like going back to the SKU, about the SKU rationalization, brand rationalization, Consumer Beauty. This has been obviously a very long journey. And I just wanted to see what inning you are in terms of that, if -- how many more iterations of that you think you need? And then related to that on the cost side, I think you talked about returns or obsolescences impacting your numbers. How -- again, how we should be thinking where these margins will land?...

**Markus Strobel**
*Executive Chairman & Interim CEO*

> Yes. Well, I think in terms of getting the innovation to a place where it really makes sense for shelf and retail productivity. I mean ***in the past, you probably know that we put out such a big innovation bundle every spring and every fall that we almost like crowded out productive SKUs on the shelf***. So ***it's a double whammy***. You have stuff out there that doesn't sell and you have lost some productive SKUs. And if you add it all up, it's all coming back to you in either returns or obsolescence, okay? And ***we're still suffering from the hangover of that***. But this quarter, ***Q3 was the first time where we are breaking that cycle***. And we're going to break the cycle even more in the fall bundle, which is going to be sharper. And the most important thing, it's not like just reducing the number of properties. It's actually important to bring properties out there that resonate with the consumer.…

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

132. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding Coty, and their control over and/or receipt and/or modification of Coty's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

### A. Strobel's and Defendant Mercier's Admissions Support a Strong Inference of Scienter

#### 1. Over Innovation

133. During the 2Q2026 Pre-Recorded Earnings Call, Strobel and Defendant Mercier made several admissions concerning Coty's product innovation and spend during the Class Period contradicting Defendants' above-cited Class Period statements on those subjects. For example,

Strobel stated that Coty had "***over 1,000*** possible brand and market combinations" which resulted in resources being "stretched across too many permutations." Strobel conceded that "***[o]ver the past couple of years***, in both Prestige and Consumer Beauty, Coty has funded ***too many projects and initiatives***."

134. Defendant Mercier confirmed that Coty's expansive product launches and initiatives undermined Company performance across the board. For example, Mercier admitted that "operational discipline has slipped ***across the organization over the past 2 years***" which had manifested in the over proliferation of SKUs and, as an example of the lack of discipline, cited the fact that "the ***number of SKUs*** in our annual CoverGirl innovation bundle ***has almost doubled*** in recent years…." Mercier also conceded that "too many launches and initiatives" slowed Prestige growth due to "service issues in the Prestige business during Q2."

135. During the 2Q2026 Earnings Call Q&A, when asked by an analyst about what was driving the gap between Consumer Beauty and top-line growth, Mercier replied that "we know where the gaps are" and Coty was "still in this phase" of having too many innovations which was "still hurting the top line" due to product returns.

136. Later during the same call, Strobel responded to an analyst question regarding streamlining product initiatives in Consumer Beauty by admitting that, in just the ***last couple of weeks***, Coty had focused on key assets and there would be sharper and smaller product bundles in the future.

137. These admissions of Coty's continued pursuit of too many product initiatives undermining the Company's performance and that, in ***February 2026***, Coty was just then addressing those issues, are in stark contrast Defendants' Class Period misstatements, dating back

to ***May 2025***, that Coty had strategically switched to "fewer and more impactful" product initiatives and was focusing on a "select number of structurally profitable and growing beauty categories and geographic markets." Thus, these admissions support a strong inference of scienter.

**2. Hugo Boss Bottled Beyond**

138. During the 2Q2026 Pre-Recorded Earnings Call, Strobel elaborated on Coty's insufficient operational discipline by citing as a prime example the Hugo Boss Bottled Beyond launch which "***did not translate into the growth of the broader Hugo Boss brand in the past 2 quarters***." In other words, despite being, as Defendants described, "probably the biggest launch of the company's history," all of that investment admittedly resulted in zero growth for the "broader Hugo Boss brand" in the first half of FY2026.

139. During the 2Q2026 Earnings Call Q&A, Strobel reiterated that "We've ***launched Boss Bottled Beyond in summer***" but that the "[p]roblem is ***our Hugo Boss franchise in total is not growing***. ***So the innovation is great, but it has no halo effect on the core***."

140. Strobel's admissions demonstrate that Nabi and Mercier's multiple Class Period claims that the Boss Bottled Beyond launch "is elevating the Hugo Boss brand equity," "is unlocking a significant untapped opportunity for Hugo Boss in the U.S. market," that Coty's fragrance brands were "also amplified by very powerful innovation and BOSS Beyond Bottled is one of them," and that Boss Bottled Beyond is "going to ***continue*** and amplify," were made with at least severe reckless disregard for their truth and thus support scienter.

**B. Defendants' Regular and Detailed Commentary, Holding Themselves Out as Knowledgeable, and in Response to Analyst Questions, Shows They Closely Monitored and Tracked Product Performance**

141. Throughout the Class Period, Defendants regularly provided updates on, and received analyst questions about, granular issues related to product innovation, strategies, trends, prioritization, consumer behavior and demand, and marketing spend, and the Boss Bottled Beyond launch effects. Defendants did not demur or claim ignorance of these matters. Rather, the Individual Defendants repeatedly volunteered highly detailed commentary, and provided highly detailed answers to analysts' questions, indicating their extensive personal knowledge of these subject areas.

142. For example, at the very start of the Class Period, during an analyst exchange about Coty's Consumer Beauty strategy at the May 7, 2025 3Q2025 Earnings Call Q&A, Nabi stated that Coty had conducted "a lot of studies" to understand the "levers" which enabled them to be "granularly decisive" in making the correct product prioritization and marketing and other resource allocation decisions to support Coty's most profitable color cosmetics products:

> **Susan Kay Anderson**
> *Canaccord Genuity Corp., Research Division*
>
> … I think in your prepared comments you talked about rebalancing your resources to profit. Not sure if you meant just within Consumer Beauty or the whole portfolio…Or do you want to refocus your efforts here towards profitability and then some more consumer innovations….
>
> **Sue Y. Nabi**
> *CEO & Director*
>
> …
>
> So on this side, **<u>what we are doing on the color cosmetics part is that we are making our efforts even more granularly decisive</u>**, meaning that ***we've made a***

> ***lot of studies to understand what are the levers*** that can **support properly the brands with the highest return on investment**, which really allow us to free some resources to put them behind mass fragrances, which are, by the way, much more profitable with gross margins much higher than color cosmetics.…

143. During the August 20, 2025 4Q/FY2025 Pre-Recorded Earnings Call, Mercier demonstrated acute and detailed awareness of consumer trends in cosmetics, stating "***Our analysis of cosmetics category weakness points to*** value-seeking behavior, ***some fatigue with innovation as consumers circle back to basics and less frequent usage***, particularly with Gen Z migrating to fragrances." Nabi also demonstrated acute and detailed awareness of consumer trends in fragrances, stating:

> Fragrances remain a structurally growing category, and we expect the structural drivers behind this renaissance to continue. ***We are seeing new cohorts entering the category***, including men, Hispanic consumers and Gen Z, all of whom are expanding the consumer base while usage is increasing. ***Half of U.S. prestige fragrance consumers are now heavy users***, up a couple of percent from a year ago, and that number rises to over 60% among Gen Z consumers.
>
> ***We are also seeing consumers move up the penetration curve*** Prestige fragrance penetration has grown meaningfully in the U.S., though it still trails Europe. And the fragrance Wardrobe is in full effect with consumers of all age groups regularly using about 4 different fragrances and remaining loyal to their repertoire, a significant change from a decade ago and they actively experiment with different scenting formats. Fragrances are central to the booming treatonomics trend, offering mood boosting value amid economic uncertainty.

During that call, Nabi claimed Defendants were using this "sharpened focus" to "rebalance[e] resources towards higher return focused opportunities."

144. During the 4Q/FY2025 Earnings Call Q&A, Nabi also responded to an analyst's question about investment levels in mass color cosmetics by referencing consumer studies and insights regarding "innovation fatigue" and calibrating marketing spending that Defendants had obtained ***throughout 2025***:

**Olivia Tong Cheang**
*Raymond James & Associates, Inc., Research Division*

… Since you touched on it, I do want to talk a little bit about Consumer Beauty. First, around the mass color side. Just your commentary from last night's prepared remarks around the evolution of investment levels, particularly in mass color and how you're thinking about levels of investment this year versus last year and then going forward?…

**Sue Y. Nabi**
*CEO & Director*

So yes, on the first part, Olivia, which is around how we are going to invest behind our color cosmetics category. Indeed, I think the tone is clear. This … was not just a decision driven by the P&L, even if the P&L is clearly telling us to go in this direction.

But it's also driven by ***what we learned throughout the 2025 year***, where we realized that … the move from traditional media to mainly advocacy, marketing was a little bit too radical for a brand like CoverGirl. So what we are realizing is that this market and including the dynamics of the markets are today hurt by … and this is interesting to hear, ***innovation fatigue, this is something we hear***….

***These are the things we learned from the recent studies we have made***. I think a lot of loyal consumers, above 30 years old consumers got lost in translation given the complexity of this category today….

So there is a kind of innovation fatigue, and ***we used the influencer marketing tool to talk to everyone***. The decision we have made is to dedicate the, I would say, most sophisticated innovative products to the youngest who are those who understand this very well and easily get into the complexity of the category while coming back to traditional advertising when it comes to categories that are the biggest, by the way, in the color cosmetics category such as mascaras and foundations, which are, by the way, the strength of our brands.

And we believe that this way of doing will allow us to invest less in absolute value and in a very ROI-driven way. So this is the way I would explain the shift that's ***driven by consumer understanding*** loyal consumers that were mistreated in a way for the last 2 years by everyone, including us, but also P&L wise, as I explained earlier.…

145. Later during the same call, Nabi responded to an analyst's question about whether Coty's Prestige fragrance segment was experiencing any pullback by granularly examining trends by specific consumer demographics:

> … on the Prestige fragrance market in the past, the market was fueled by co-ops entering the market, and you rightly mentioned Hispanics in the U.S., you mentioned also men, you mentioned also Gen Zs, and if there is a pullback in some of these demographics?
>
> ***We don't see a pullback in these demographics. We even see a penetration curve continuing to increase among the main demographics*** that are the Gen Z consumers, specifically the teen male consumers who are today those behind the biggest successes in male fragrances.
>
> That's one of the reasons, probably the latest HUGO BOSS Beyond launch is resonating so well. It's because it also attracts this younger generation versus what we did in the past. ***The Hispanic community is continuing to be another consumer*** of, I would say, very strong and long-lasting fragrances, ***which we have seen consistently continuing***.
>
> And last, but not least, ***we also see that among Gen Zs, the heavy users proportion has never been higher than now***. So they own a lot of fragrances, sometimes 3 or 4, which is what is called the wardrobe effect. And we see now the perfume mix phenomenon becoming part of this scenting index at large, as I like to call it. So to answer in short, ***we don't see pull back from any of these demographics***.

Indeed, in explaining fragrance and other trends, Nabi frequently claimed direct knowledge of consumer feedback, *e.g.*, stating on the 4Q/FY2025 Earnings Call Q&A that "I'm quoting what consumers told us."

146. Further, on the 1Q2026 Pre-Recorded Earnings Call, Nabi claimed that Defendants were closely following "the results from our recent operational interventions" including that Coty was purportedly then "improving our core prestige fragrance performance" and "accelerating in adjacencies such as ultra-premium fragrances and fragrance mist" and offering other considerable detail thereon.

147. With respect to Boss Bottled Beyond, Defendants indicated they were closely monitoring the results of the launch, with Nabi claiming in the August 20, 2025 4Q/FY2025 Press Release that "results on our recently-launched Boss Bottled Beyond [are] already exceeding our … benchmarks," and, on the 1Q2026 Pre-Recorded Earnings Call and 1Q2026 Earnings Call Q&A, discussing Boss Bottled Beyond's current status and launch rankings in Europe, Australia, and the U.S.

148. Defendants' numerous, detailed discussions with analysts and investors regarding segment performance and specific products and consumer trends and results are probative of Defendants' knowledge of those subjects and support a strong inference of scienter. Indeed, Defendants claimed to analysts during the 4Q/FY2025 Earnings Call Q&A generally that they were able to "share[] very precise guidance" because "***we have this visibility***."

### C. Defendants' Next Phase of All-in to Win Program, and Active Involvement in an Extensive Strategic Review, Support Scienter

149. At the very beginning of the Class Period, in the April 2025 Press Release, Coty announced the next phase of the All-in to Win transformation program with one its four "Key Pillars" being that it would "[s]tep-change innovation impact[,]"by "focus[ing] organizational efforts…into fewer and more impactful initiatives."

150. Defendants themselves touted their focus on executing the transformation program's "focused innovation" pillar. For example, during the 4Q/FY2025 Pre-Recorded Earnings Call, Defendant Nabi highlighted the program's next phase and emphasized that Coty was "refocusing on our core strength…" and "focused on growing Coty's footprint and diversification in a select number of structurally profitable and growing beauty categories and

geographic markets[.]" In the 4Q/FY2025 Press Release, Nabi touted Coty's "proactive management of underperforming areas, and organizational discipline" to focus on Coty's core strengths.

151. Additionally, Defendants' personal involvement in Coty's "comprehensive strategic review" of its Consumer Beauty business, which as reflected in Coty's September 2025 Press Release, included "assess[ing] a full range of alternatives including partnerships, divestitures, spin-offs, and other potential strategic actions," including how each product fit into Coty's overall product portfolio to "maximiz[e] long-term value," further supports scienter. For instance, during the 1Q2026 Earnings Call Q&A, an analyst pressed for further detail on Coty's strategic review of the Consumer Beauty division in particular and Nabi elaborated that she and Gordon Von Bretten, newly announced President of Consumer Beauty, were personally involved in that deep-dive review and "at the helm" of driving growth and profitability in color cosmetics:

> **Shovana Nafiz Chowdhury**
> *JPMorgan Chase & Co, Research Division*
>
> … You addressed the strategic review to Oliver's question earlier, but I wanted to dig a bit further into how you're thinking about the various options. Can you give us more color on the results that would inform your decision for each of the options out of this review, whether you decide to keep the business given like you're trying -- you had management changes and you just mentioned you're trying with CoverGirl testing out on TikTok, or would it be a JV or an outright sale? Given the strategic review, how do you prioritize the decision of the strategic review versus the welless (sic) sale?
>
> **Sue Y. Nabi**
> *CEO & Director*
>
> …
>
> On the other side, ***regarding the color cosmetics business, there, again, the strategic review is a real one. It's not just a word to mean something else. It's really reviewing*** our strategic options. The first one is by nature to do the job of making this business as growing and as profitable as possible and as quickly as

> possible. And there, the go that ***Gordon and myself are having at the helm of this business***, hopefully will produce quick results that we will see in the coming quarters. Then there is a deeper work that's going to be done on the cost structure, on the gross to net ability to lower this part that is today very, very heavy, but also on the A&CP allocation. We believe we went too far in terms of by nature, the least loyal consumers on earth instead of keeping our key loyal millennial and Gen X users, which are the big portion of the market, but also the ones that are growing more and more this kind of market, given the indie brands are not growing anymore in the market.…

152. In Coty's September 30, 2025 press release, Gordon von Bretten was quoted as saying, "I am honored to ***lead*** this next phase of value creation ***together with Ms. Nabi***," and Nabi was quoted as saying that von Bretten would be "reporting to me."

153. Thus, it would be absurd to suggest that Defendants were unaware of the pervasive over-innovation issues when those issues were directly related to Coty's strategic transformation program and strategic review to purportedly improve the same.

### D. Senior Leadership Regularly Discussed Information in Meetings and Regular Reports That was Readily Accessible to the Individual Defendants

154. Throughout the Class Period, Coty's senior leadership monitored product performance and product resource prioritization through regular reports and meetings.

155. CW1 prepared weekly trend and status check reports, including on sales, promotional spending, and monthly budget performance. CW1's reporting was communicated via email, shared drives, and monthly reporting packages.

156. CW1 stated that, throughout 2025, Consumer Beauty showed persistent negative trends and the FY2026 forecast did not assume a turnaround. According to CW1, it was "widely known" within Coty that Consumer Beauty was "tanking." CW1 explained that the consensus across finance and sales leadership was that the category was underperforming U.S. mass

cosmetics. CW1 specifically recalled that Sally Beauty nail products and CoverGirl were underperforming and viewed negatively.

157. According to CW1, U.S. leadership, including Zavlowsky, Botero, and Foutres, expressed concern about product directives and viewed several launch decisions negatively.

158. CW1 also prepared executive-level packages, which were sent to the direct reports of the CFOs of each business segment. CW1 confirmed that Victoria Evans, Consumer Beauty CFO, and Gregoire Hedde, Prestige CFO, both of whom reported to Defendant Mercier, reviewed the executive-level packages.

159. CW1 also attended monthly meetings to review financial performance with Zavlowsky and members of the Americas finance team. CW1 recalled recurring discussions and reporting from sales leadership that made clear Consumer Beauty trends were negative.

160. Indeed, CW1's discussions with the FP&A leadership team, monthly reviews, and cross-functional exchanges were all the same: Consumer Beauty performance remained weak and no one suggested that the category was turning around.

161. CW1 personally reviewed 2025 data confirming the same, including worsening Consumer Beauty sell-through trends and retailers reducing orders and pushing back on inventory levels.

162. According to CW1, retailers periodically provided inventory-cleaning data and sell-through statistics, which were typically shared internally through PowerPoint materials from sales with updates from leaders such as Botero.

163. CW1 also observed that Prestige sell-out slowed during 2025, noting that performance was weaker than budgeted. CW1 recounted that, in 2025, Botero prepared risk

synopses with conditions related to Prestige performance expectations because achieving Prestige forecasts was at risk.

164. In sum, throughout the Class Period, Coty had structured reporting chains to funnel information and data concerning product performance and product resource prioritization. Accordingly, the Individual Defendants knew or recklessly disregarded that Coty was not curtailing over-innovation or channeling resources to the Company's core profitable products and that the Boss Bottled Beyond launch was not generating a halo effect.

### E. The Suspicious Timing and Context of Defendant Nabi's Sudden Departure Supports Scienter

165. On December 22, 2025, Coty announced Nabi would "cease to serve" as the CEO and resign as a member of the Board less than two weeks later on December 31, 2025. Coty also did not name a permanent successor. According to a December 14, 2025 article in BeautyMatter.com, an industry publication reporting on the possibility of Nabi's imminent departure, the change occurred despite the fact that Nabi had "recently told top Coty employees that she would remain in the top job for another five years, according to a person familiar with the matter."[3] However, on February 5, 2026, Coty filed the Nabi Separation Agreement revealing that she was "terminate[d]."

166. The timing and context of Nabi's departure supports that Nabi's claims during the Class Period of (i) curtailing over-innovation and channeling resources to Coty's core profitable products consistent with Coty's All-in to Win program, and (ii) Boss Bottled Beyond's halo effect

[3] Sabela Ojea, *Coty Chair Peter Harf Set to Step Down, CEO Sue Nabi Could Follow, FT Reports*, BeautyMatter, (Dec. 14, 2025), https://beautymatter.com/articles/coty-chair-peter-harf-set-to-step-down-ceo-sue-nabi-could-follow-ft-reports.

were knowingly false when made, and upon being demonstrated to be so, resulted in her termination, supporting scienter.

### F. Corporate Scienter

167. The allegations above also establish a strong inference that Coty acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants Nabi and Mercier, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

168. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Coty under *respondeat superior* and agency principles.

## IX. LOSS CAUSATION

169. During the Class Period, as detailed herein, Defendants materially misled the investing public, thereby inflating the price of Coty's securities and/or maintaining the artificial inflation in Coty's securities, by publicly issuing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about Coty's business, operations, and prospects as alleged herein.

170. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false or misleading statements concerning the Company's business prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

171. Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of the Company's services, customer relationships, strategic initiatives, and facilities, thus causing Coty's securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made or endorsed by Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing Coty's stock at artificially inflated prices, thus causing the damages complained of herein.

172. Beginning after market close on August 20, 2025, Defendants issued the first set of corrective disclosures contained within the: (i) August 20, 2025 4Q/FY2025 Press Release; (ii) August 20, 2025 4Q/FY2025 Pre-Recorded Earnings Call; (iii) August 21, 2025 FY2025 Form 10-K; and (iv) August 21, 2025 4Q/FY2025 Earnings Call Q&A. This set of corrective disclosures partially revealed, *inter alia*, that, contrary to Defendants' representations, certain customers were experiencing "fatigue" due to Coty's over-innovation with respect to color cosmetics.

173. Analysts were surprised by Defendants' disclosures and reacted negatively. For instance, the August 21, 2025 Citi report downgraded its rating of Coty's stock to Neutral and reduced the Company's stock target price by ***34.6%***. The analysts stated that "[e]ven though the

bar was very low for COTY post YTD underperformance, ***F4Q25 results were worse than expected***…" The analysts added that there was "limited visibility on a F2H26 recovery."

174. On August 21, 2025, Jefferies published a report titled "Stepping to the Sidelines Amid Ongoing Operational Issues; Downgrade to Hold" and lowered its target price for Coty by ***33%***. The analysts concluded that the lack of "clear fundamental drivers" for a second half recovery and management credibility impaired the Company's FY2026 outlook.

175. On August 21, 2025, after Defendants' partially corrective disclosures, the price of Coty's common stock declined, on unusually heavy trading volume, from a closing price of $4.86 per share on August 20, 2025, to an intraday low of $3.75 per share (a 22.84% decline), and hitting a high of $3.96 per share, before closing at $3.81 per share that day (a 21.60% decline).

176. Beginning after market close on February 5, 2026, Defendants issued the second set of corrective disclosures contained within the: (i) February 5, 2026 2Q2026 Press Release; (ii) February 5, 2026 2Q2026 Form 10-Q; (iii) February 5, 2026 2Q2026 Pre-Recorded Earnings Call; and (iv) February 6, 2026 2Q2026 Earnings Call Q&A. This set of corrective disclosures revealed, *inter alia*, that, contrary to Defendants' representations, (i) Coty had not been curtailing over-innovation and channeling resources to Coty's core profitable products consistent with Coty's All-in to Win program, and (ii) the Boss Bottled Beyond launch did not generate a halo effect.

177. Analysts were shocked by Defendants' disclosures and reacted swiftly and negatively thereto, with downgrades and/or commentary attributing the shortfalls to the very subject areas of Defendants' alleged false and misleading statements during the Class Period, including Coty's over-innovation and related misallocation of resources and inability to generate the claimed "halo effect" for major launches (*i.e.*, Boss Bottled Beyond).

178. For example, a February 6, 2026 Citi Research analyst report lowered Citi Research's price target for Coty stock from $3.50 to $3.00, noting that Coty delivered "mixed" results and "missed GM% and EBITDA" and "weaker-than-expected F326 guidance highlighting increasing promos in [P]restige fragrances & changes in Consumer Beauty strategy," and elaborating that these "changes" would include "discontinuing smaller, non-needle moving initiatives including in mass fragrances" and "refocusing & prioritizing its top market, brands," as well as "initiatives ensuring these items are fully funded with investments to fuel sustainable growth and create halo effects[.]"

179. The same day, Raymond James issued a report entitled, "F2Q26 Earnings: New Management Offers Sobering Reset; Cutting Estimates" and stated that Coty's 3Q outlook was a "***total surprise***[.]" The report noted that "COTY's early diagnosis of its shortfalls are that the company has not effectively leveraged its launches, with recent launches failing to lift the total franchise" (referring to Strobel's admission of the lack of a Hugo Boss Bottled Beyond "halo" effect), "tighter SKU and innovation discipline" and "exiting smaller initiatives[,]" and "shifting advertising and other brand support behind core franchises[.]" The report described a "[s]obering" near-term, and cited "low visbility [sic]" into any "near-term turnaround[.]"

180. A February 6, 2026 Jefferies report similarly noted that in the aftermath of the poor earnings, Coty acknowledged it needed to have "fewer priorities, more disciplined resource allocation, and innovation that reinforces core franchises rather than expanding into fragmentation. Mgmt acknowledged that excess SKUs, diffuse projects, and scattered initiatives have stretched the organization, [and] pressured margins…." The report also noted that "Q2 saw elevated promo activity, esp. across Prestige fragrance," and that "[i]n Prestige, …. inconsistent halo effects and

insufficient core support have weighed on total-brand share." Jefferies cut its earnings estimates and price target for Coty from $3.50 to $2.90.

181. A February 6, 2026 Barclays report, entitled, "Confessional," lowered the firm's price target for Coty from $3.00 to $2.50, and noted that

> [T]he past 2+ years we've found it difficult, quite frankly, to listen to Coty's prepared remarks and Q&A calls, as it has felt like the company was so out of touch with its challenges, … This quarter was a refreshing change in that the company didn't 'sugarcoat' the many deep-seated issues at hand or the fact that financial performance has not met expectations, to put it lightly.
>
> …
>
> We appreciated hearing a candid and raw discussion of what has gone wrong over the past few years
> In particular, new management pointed to getting out of a cycle of funding too many projects and initiatives with low ROI which were ultimately a distraction from large, higher potential core franchises.

182. Acknowledging the Company's new forthrightness, Barclays stated that "the first step in any turnaround is being able to regain investor trust and give guidance that is believable..."

183. A February 8, 2026 Deutsche Bank report entitled "More Strategic Shifts," cut Coty's price target from $4 to $3 and noted Coty was reacting to its poor performance by "streamlining the FY27 innovation pipeline[,]" "prioritizing A&CP re-allocation to core brands[,]" and "refining its investment allocation." In cutting its estimates, the report also cited "executional challenges" in the Consumer Beauty division (which had included the over-innovation and resource allocation challenges described by Strobel) and "a significantly weaker-than-expected 3Q26 outlook and the withdrawal of the full-year FY26 EBITDA and FCF guidance."

184. Reports issued on February 9, 2026 by JP Morgan Chase and RBC Capital Markets noted "Strobel's sense of urgency around stabilizing the business" and that "[t]his is a transitional

moment for the company[,]" with JP Morgan adding that "[w]e believe investors do not have the patience for a self help story at this juncture as evident in the stock price reaction down," and RBC cutting their price target 20% from $10 to $8.

185. On February 6, 2026, in response to Defendants' corrective disclosures, the price of Coty's common stock fell sharply, declining from a closing price of $3.15 per share on February 5, 2026 to an intraday low of $2.44 per share (a decline of 22.5%), before closing at $2.66 that day (a decline of 15.6%), on unusually heavy trading volume, and thereby removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who had purchased Coty's securities during the Class Period.

186. As a result of their purchases of Coty's securities during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price declines in Coty's securities, the statements in the Company's corrective disclosures, and the market's reaction negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Companies that were unrelated to Defendants' fraudulent conduct.

## X. CLASS ACTION ALLEGATIONS

187. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Coty securities between May 7, 2025 and February 6, 2026, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

188. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Coty's securities actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, as of January 29, 2026, there were over 880 million shares of Coty common stock issued and outstanding, and Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Coty or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

189. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct as alleged herein.

190. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

191. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Coty's business and operations;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period; and
- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

192. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. PRESUMPTION OF RELIANCE

193. Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for Coty's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- Coty's securities were actively traded on the NYSE;
- The market price of Coty securities reacted promptly to the dissemination of public information regarding the Company;

- Coty's stock was followed by several financial analysts, including those cited in this Complaint;
- The average weekly trading volume for Coty stock during the Class Period was approximately 8 million shares;
- As a regulated issuer, Coty filed with the SEC periodic public reports during the Class Period;
- Coty regularly communicated with public investors via established market communication mechanisms; and
- During the Class Period, Coty had over 880 million shares in the public float and the Company's market capitalization ranged between approximately $2.3 billion and $4.5 billion.

194. Throughout the Class Period, Coty was consistently followed by the market, including securities analysts and the media. The market relies upon Coty's financial results and management to accurately present the Company's financial results. During the Class Period, Defendants continued to pump materially false and misleading information into the marketplace regarding Coty and material facts concerning (i) over-innovation and resource allocation to Coty's core products consistent with Coty's All-in to Win program, and (ii) Boss Bottled Beyond's halo effect. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of Coty's securities.

195. As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Coty securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory

applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

196. Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Coty securities at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

197. Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

198. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Coty securities at artificially inflated prices.

## XII. NO STATUTORY SAFE HARBOR

199. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

200. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

201. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Coty who knew that the statement was false when made.

## XIII. CLAIMS FOR RELIEF

### COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

202. Plaintiffs reallege each allegation as if fully set forth herein.

203. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

204. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Coty securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Coty securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

205. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for Coty securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

206. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Coty's allegedly materially misleading statements, and/or their associations with Coty which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

207. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of Coty to members of the investing public, including Plaintiffs and the Class.

208. As a result of the foregoing, the market price of Coty securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and of Defendants' knowing and/or reckless inability to effectuate their purported business plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Coty securities during the Class Period in purchasing Coty securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

209. Had Plaintiffs and the other Class members of the Class been aware that the market price of Coty securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Coty securities at the artificially inflated prices that they did, or at all.

210. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs' and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased Coty securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of Coty securities through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of,

among other things, Defendants' concealment of material facts related to Coty's business and operations, in violation of federal and state laws.

211. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Coty securities during the Class Period.

## COUNT II

## FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

212. Plaintiffs reallege each allegation as if fully set forth herein.

213. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

214. Coty and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

215. The Individual Defendants acted as controlling persons of Coty within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause Coty to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

216. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of Coty, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the

Company's SEC filings, press releases and interviews with various news sources and statements to market analysts cited herein related to Plaintiffs' and the Class's investments in Coty securities within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

217. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

218. The Individual Defendants knew or recklessly disregarded the fact that Coty's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

219. By virtue of their high-level positions and their participation in and awareness of Coty's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents and statements that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

220. As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

221. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Coty securities.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as Class Representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D. Granting Plaintiffs leave to amend this complaint to conform to the evidence; and

E. Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## XV. JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: August 31, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: */s/ Gregory M. Potrepka*
Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
Andrew L. Lencyk (AL-4329)
Tyler Winterich (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403

Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
alencyk@zlk.com
twinterich@zlk.com

*Counsel for Co-Lead Plaintiff Solozobova*

**POMERANTZ LLP**

By: *<u>/s/ Luc W. M. Mitchell</u>*
Alexander Hood II
Luc W. M. Mitchell
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com
lmitchell@pomlaw.com

*Counsel for Co-Lead Plaintiff Logelin*